**2000 ND 25**

**STATE of North Dakota, Plaintiff
and Appellee,**

v.

**Dale Joseph BURKE, Defendant
and Appellant.**

**No. 980312.**

Supreme Court of North Dakota.

Feb. 22, 2000.

Mark R. Boening, Assistant State's Attorney, Fargo, for plaintiff and appellee.

Joe A. Johnson, Fargo, for defendant and appellant.

KAPSNER, Justice.

[¶ 1] Dale Joseph Burke appeals from a criminal judgment entered upon a jury verdict finding him guilty of two counts of murder and one count of arson. We hold there was sufficient evidence to support Burke's convictions, the admission of DNA evidence was not obvious error, Burke was not denied a fair trial because of prosecutorial misconduct, and Burke failed to establish ineffective assistance of counsel. We therefore affirm.

## I

[¶ 2] At approximately 9:45 p.m. on April 27, 1997, Fargo firefighters responded to a report of a fire at the home of Larry Nelson and Edmund Huotari. The firefighters found the home in flames and, later, the bodies of Nelson and Huotari inside. A medical examiner concluded they both died from being repeatedly struck in the head with a blunt object.

[¶ 3] Fargo police suspected Burke killed Nelson and Huotari and set the home on fire to conceal the killings. On April 29, 1997, an Information was filed charging Burke with two counts of murder and one count of arson. The next day, Burke was arrested in Seward, Nebraska at the residence of Jan Thomas, Burke's former girlfriend. Thomas gave some of Burke's clothing, including a pair of bloodstained blue jeans, to Officer Hoag, one of the arresting officers.

[¶ 4] On May 2, 1997, Burke appeared before the district court. Burke asserted he had several mental disorders. Burke's attorney later successfully moved for Burke's commitment to the state hospital for a psychological evaluation. Burke's attorney also successfully moved for public funds to hire an investigator. During the June proceeding at which Burke waived his right to a preliminary hearing, Burke's attorney indicated he had not yet hired an investigator. In September 1997, Burke's attorney indicated the case was not ready for trial and requested the case be put on the December trial calendar. In December 1997, Burke's attorney successfully moved for an order allowing him to depose Kathy Lorsung, Burke's girlfriend at time of the crimes.

[¶ 5] In January 1998, Burke's attorney successfully moved for a continuance and for public funds to acquire independent DNA testing. At dispositional conferences in February and March of 1998, Burke's attorney indicated he was waiting for the results of the independent testing. The next month, Burke's attorney indicated he was still waiting for the testing results and would be ready for trial in June.

[¶ 6] A jury trial began on July 7, 1998. The State presented the pair of blue jeans and an expert who performed polymerase chain reaction DNA testing on them. The expert testified that statistically 1 in 17,000 white persons would have DNA that matched the DNA in the blood on the jeans and Huotari's DNA matched the DNA in the blood on the jeans.

[¶ 7] Gary Bockness testified he and Burke had a conversation a few days before the killings. Bockness asserted Burke said he planned to kill Huotari and blame Bockness. Bockness also testified he himself had an ongoing feud with Huotari. Bockness conceded that during his deposition he had stated Burke said he planned to kill not only Huotari but Nelson as well.

[¶ 8] Jeneen Dahl, a gas station attendant, testified regarding two gas purchases by Burke on the night of the crimes. She indicated Burke purchased $1.85 in gas at about 7:30 or 7:45 p.m. and $10.00 in gas about one hour later.

[¶ 9] Other witnesses testified Burke was at Huotari and Nelson's home shortly before the fire. David Myles said he saw Burke leave the residence at about 8:30 p.m. and return ten to fifteen minutes later. Myles also stated he later saw Burke near Burke's car. Darrin Peterson testified that at 9:08 p.m., Burke called the Peterson residence from Huotari and Nelson's home.

[¶ 10] Burke testified on his own behalf. He said he had moved in with Nelson and Huotari about three weeks before the crimes. Burke asserted Huotari had cut himself when the two were installing carpet and Huotari's blood got on Burke's jeans at that time. Burke testified he had left town on the night of the killings and the fire because he panicked, thinking he had accidentally started the fire by putting a penny behind a fuse. During cross-examination, the prosecutor questioned

Burke about his drug use, and Burke admitted he had used drugs in the past. The prosecutor also questioned Burke about his statements to a police detective shortly after his arrest.

[¶ 11] The jury convicted Burke for both counts of murder and for arson. Judgment was entered on September 17, 1998. Burke appealed.

## II

■■■■ [¶ 12] Burke argues there was insufficient evidence to support his convictions. A challenge to the sufficiency of the evidence is reviewed by drawing all inferences in favor of the verdict. *State v. Lusby,* 1998 ND 19, ¶ 5, 574 N.W.2d 805. This Court will reverse a conviction only if, after viewing the evidence and all reasonable evidentiary inferences in the light most favorable to the verdict, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Id.*

[¶ 13] Under N.D.C.C. § 12.1–16–01:

1. A person is guilty of murder, a class AA felony, if the person:

 a. Intentionally or knowingly causes the death of another human being; [or]

 b. Causes the death of another human being under circumstances manifesting extreme indifference to the value of human life[.]

[¶ 14] Under N.D.C.C. § 12.1–21–01:

A person is guilty of arson, a class B felony, if he starts or maintains a fire or causes an explosion with intent to destroy an entire or any part of a building or inhabited structure of another or a vital public facility, or if he starts or maintains a fire or causes an explosion with intent to destroy or damage his own real or personal property for the purpose of collecting insurance for the loss.

■■ [¶ 15] The State submitted significant evidence establishing Burke violated N.D.C.C. § 12.1–16–01 and N.D.C.C. § 12.1–21–01. Witnesses indicated Burke had made two gasoline purchases on the night of the crimes, Burke was present at the Nelson and Huotari residence shortly before the crimes, and Burke had said he planned to kill Huotari. DNA evidence indicated Huotari's blood likely was on Burke's jeans. Burke testified Huotari's blood was on his jeans. Finally, Burke had gone to Nebraska shortly after the crimes. From this evidence, a rational jury could have inferred Burke planned and actually killed Huotari and Nelson and then set their home on fire to destroy evidence and thus could have found Burke guilty beyond a reasonable doubt of two counts of murder under N.D.C.C. § 12.1–16–01 and one count of arson under N.D.C.C. § 12.1–21–01.

## III

■■■ [¶ 16] Burke asserts the DNA evidence should not have been admitted because it was not shown to be sufficiently reliable. Because Burke failed to object to the admission of the DNA evidence at trial, our inquiry is limited to determining if admission constitutes obvious error affecting substantial rights. *State v. McDonell,* 550 N.W.2d 62, 64 (N.D.1996). "We exercise our power to notice obvious error cautiously and only in exceptional circumstances where the accused has suffered serious injustice." *State v. Olander,* 1998 ND 50, ¶ 12, 575 N.W.2d 658. Under the test for recognizing obvious error, a defendant has the burden to show (1) an error, (2) that is plain, and (3) affects substantial rights. *Id.* at ¶¶ 14, 16. In applying the test, we inspect the entire record and the probable effect of the alleged error in light of all the evidence. *Id.* at ¶ 12.

[¶ 17] Generally, polymerase chain reaction ("PCR") DNA testing is well established and accepted as a reliable tool for procuring evidence.[1] Several courts have

---

1. We note N.D.C.C. § 31–13–02 provides DNA evidence is admissible to establish iden- tity:

upheld admission of DNA evidence[2] under the *Frye* test,[3] concluding DNA evidence is generally accepted in the relevant scientific community. *See People v. Pope,* 284 Ill.App.3d 695, 220 Ill.Dec. 309, 672 N.E.2d 1321 (1996); *State v. Hill,* 257 Kan. 774, 895 P.2d 1238, 1247 (1995); *People v. Lee,* 212 Mich.App. 228, 537 N.W.2d 233, 257–58 (1995); *People v. Wesley,* 83 N.Y.2d 417, 611 N.Y.S.2d 97, 633 N.E.2d 451, 455 (1994); *State v. Russell,* 125 Wash.2d 24, 882 P.2d 747, 768 (1994). Other courts have determined DNA evidence is sufficiently reliable and upheld admission under evidentiary rules. *See United States v. Martinez,* 3 F.3d 1191, 1196–98 (8th Cir.1993) (applying the test established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *State v. Brown,* 470 N.W.2d 30, 32 (Iowa 1991); *Commonwealth v. Rosier,* 425 Mass. 807, 685 N.E.2d 739 (1997); *State v. Moore,* 268 Mont. 20, 885 P.2d 457, 474–75 (1994); *State v. Moeller,* 1996 SD 60, ¶¶ 53–69, 548 N.W.2d 465; *Clarke v. State,* 813 S.W.2d 654, 655 (Tex.Ct.App.1991); *Spencer v. Commonwealth,* 240 Va. 78, 393 S.E.2d 609, 621 (1990).

■ [¶ 18] Further, Burke offered no evidence to suggest the particular means of DNA testing employed here were unreliable. DNA test results may be inadmissible if the means used in the particular case were not sufficiently reliable. *See State v. Zimmerman,* 516 N.W.2d 638, 642 (N.D.1994) (citing N.D.R.Ev. 104(a) and explaining "[w]hether a blood test was fairly administered is a preliminary question of admissibility left to the discretion of the trial judge"). Here, Paula Yates, the State's expert, gave considerable testimony regarding the reliability of the specific DNA testing and methodology employed. Yates explained she received the DNA samples when the samples initially came to the lab, compiled a list of the received samples, and secured the samples in an evidence room. Yates herself performed all of the tests on the samples. She performed PCR DNA testing and explained such testing involves four basic steps: (1) extracting DNA from a stain, (2) amplifying the DNA by using a machine that performs the polymerase chain reaction to copy regions of the DNA, (3) typing or coding the regions, and (4) comparing the types to types obtained from known individuals; then excluding, as possible sources of the stain, individuals with types that do not match the types in the stain and calculating, for an individual with types that match the types in the stain, the probability the individual is the source of the stain. Yates indicated PCR testing is commonly used when a DNA sample is very small or has been partially degraded. Regarding the results of the specific tests used, Yates explained approximately 1 in 17,000 persons have the DNA characteristics found in the blood on the jeans and Huotari's blood matched the DNA characteristics found in the blood on the jeans.

In any court proceeding, DNA testing is deemed to be a reliable scientific technique, and the evidence of a DNA profile comparison must be admitted as prima facie evidence to prove or disprove the identity of any person. This section does not otherwise limit the introduction of any relevant evidence bearing upon any question at issue before the court. The court, regardless of the results of the DNA analysis, if any, shall consider other relevant evidence.

2. A few states have distinguished between the admissibility of "match" evidence and "population frequency" evidence. *See State v. Bible,* 175 Ariz. 549, 858 P.2d 1152, 1193 (1993). Match evidence is evidence the tested sample has the same type or coding as the known sample. Michael A. Riley, *How Should North Dakota Approach the Admissibility of DNA: A Comprehensive Analysis of How Other Courts Approach the Admissibility of DNA,* 72 N.D.L.Rev. 607, 613, 617 (1996). Population frequency evidence relates to the incidence a type or coding appears in the general population. *Id.* at 613–14. Where a tested sample matches a known sample, population frequency evidence indicates the probability someone other than the known sample is the source of the tested sample. *Id.*

3. The *Frye* test was derived from *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923).

[¶ 19] Alleging the profile comparison statistics "were not exact enough to prove the substance found on the blue jeans was the blood of Edmund Huotari," Burke argues the probative value of the DNA evidence was outweighed by its prejudicial effect and thus the evidence was inadmissible. Under N.D.R.Ev. 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." However, Burke did not show the trial court's admission of the evidence was plain error under N.D.R.Ev. 403. Aside from alleging the profile comparison statistics were not exact enough, Burke did not attempt to show how the DNA evidence was unreliable or too prejudicial for admission.

[¶ 20] We also note Burke admitted the blood on his jeans was Huotari's blood. Accordingly, it is difficult to assume admission of the scientific evidence to show the blood samples from the jeans were compatible with Huotari's blood was prejudicial.

[¶ 21] Because PCR DNA testing is well established and accepted as reliable, no evidence indicates the particular testing methods used here were unreliable, and Burke admitted the blood on his jeans was Huotari's, we hold admission of the DNA evidence was not error.

### IV

[¶ 22] Burke argues he was denied a fair trial because of prosecutorial misconduct. At the outset, we note defense counsel failed to object to any of the alleged misconduct and thus our review is limited to determining if the prosecutor's conduct prejudicially affected Burke's substantial rights, so as to deprive him of a fair trial. *State v. Evans*, 1999 ND 70, ¶ 9, 593 N.W.2d 336.

[¶ 23] Burke relies primarily on four instances to support his prosecutorial misconduct argument. First, he asserts the prosecutor improperly asked Burke about his drug use. After Burke testified he was upset at his girlfriend, Kathy Lorsung, because she used methamphetamine and he did not want the drug life-style, the prosecutor asked Burke whether he was a drug addict. Burke responded he had been an addict in the past.

[¶ 24] The prosecutor's questioning of Burke himself was a valid attempt to impeach Burke's implication he did not approve of drugs. Rule 607, N.D.R.Ev., allows a party to attack a witness's credibility by impeachment. *State v. Klein*, 1999 ND 76, ¶ 12, 593 N.W.2d 325. The trial court's decision regarding impeachment questions will not be disturbed absent an abuse of discretion. *Id.* We conclude the trial court did not abuse its discretion in allowing the questioning.

[¶ 25] As a second instance of misconduct, Burke points to the prosecutor's question posed to witness Gary Bockness regarding Burke's past drug use. During Bockness's direct examination, Bockness indicated he and Burke spent time together partying and getting high. The prosecutor asked Bockness if he knew "whether or not [Burke] used [methamphetamine]" and Bockness replied, "Yes."

[¶ 26] Technically, the prosecutor's question and Bockness's answer only addressed Bockness's knowledge of whether Burke used drugs and did not address the issue of whether Bockness actually thought Burke used drugs. However, since the question and answer implied Bockness thought Burke actually used drugs, our inquiry must continue.

[¶ 27] Assuming allowing the question posed to Bockness was plain error, the evidence indicates the question did not affect Burke's substantial rights. The question led to testimony Burke had used drugs in the past. In light of the other evidence supporting the convictions, nothing suggests Bockness's testimony Burke had used drugs in the past affected the jury's decision. Under such circumstances, we cannot conclude the question

posed to Bockness affected Burke's substantial rights. *See State v. Mehralian*, 301 N.W.2d 409, 417–18 (N.D.1981) (reviewing the defendant's contention the trial court erred in allowing certain questions by the prosecutor and reasoning "[a]n error is reversible only if it appears from the record that the error was prejudicial, that substantial injury resulted, and that a different decision probably would have resulted absent the error"); *State v. Evans*, 1999 ND 70, ¶ 14, 593 N.W.2d 336 (citation omitted) (noting a court determining whether a defendant was prejudiced by prosecutorial misconduct should consider "the strength of the properly admitted evidence of [the defendant's] guilt").

 [¶ 28] Burke asserts as a third instance of misconduct the prosecutor's questioning Burke about his failure to offer exculpatory evidence to a police detective shortly after his arrest. Burke emphasizes the prosecutor's questions regarding Burke's failure to tell the detective about putting a penny behind the fuse at his home, being worried he had caused the fire, panicking, and driving off in a daze. He argues these questions were improper because they imply he had an obligation to offer this exculpatory version at a time when he had a constitutional right to remain silent.

[¶ 29] A prosecutor's use of a defendant's post-arrest silence after receiving *Miranda* warnings to impeach the defendant's exculpatory story, told for the first time at trial, violate the defendant's right to due process. *City of Williston v. Hegstad*, 1997 ND 56, ¶ 9, 562 N.W.2d 91.

 [¶ 30] Burke, however, did not remain silent after his arrest, and under the circumstances the prosecutor's questions were a valid means of impeaching Burke's testimony. Rule 613, N.D.R.Ev., permits using a witness's previous statements to impeach the witness's testimony. *See also State v. Demery*, 331 N.W.2d 7, 11 (N.D. 1983) (citing N.D.R.Ev. 613 and stating "[i]t is the established rule in this State that a prior inconsistent statement may be used to impeach a witness"); *Anderson v. Charles*, 447 U.S. 404, 407, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (reasoning "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent" and thus concluding use of a defendant's post-arrest statements was proper); *Michigan v. Harvey*, 494 U.S. 344, 351, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (noting "[w]e have never prevented use by the prosecution of relevant voluntary statements by a defendant" and thus concluding the defendant's prior statements made to a police officer could be used to impeach the defendant's testimony, despite a violation of the defendant's right to counsel).[4] Prior to the prosecutor's questions here, Burke had testified he discovered the house in flames, thought he had caused the fire by placing a penny behind a fuse, and "just panicked and just—just left." However, later Burke admitted he told a police detective he left Fargo because he was upset with his girlfriend because he heard she was using drugs. Burke's accounts are inconsistent.[5] Thus the prosecutor's questions were a proper means of using Burke's prior inconsistent statement to impeach Burke's testimony under N.D.R.Ev. 613.

 [¶ 31] Finally, Burke argues the prosecutor advanced a timeline theory that was not supported by the evidence. The control and scope of opening and closing arguments are largely left to the discretion of the trial court, and a verdict will not be reversed on the ground the prosecutor exceeded the scope of permissible

---

**4.** Burke does not argue to this Court his prior statements were obtained in violation of *Miranda*.

**5.** Burke actually had two other inconsistent stories. First, Jan Thomas testified Burke told her he left Fargo because "he got into a fight with a couple guys and he just thought it would be a good idea just to come and see me." Second, Darrin Peterson testified Burke indicated "his mother died and he was leaving back for Arkansas."

closing argument unless the defendant establishes the prosecution's comments were improper and prejudicial. *State v. Evans*, 1999 ND 70, ¶ 11, 593 N.W.2d 336. To be prejudicial, absent a fundamental error, improper closing argument by the prosecutor must have proceeded beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case having support in the evidence. *Id.*

[¶ 32] Here, the prosecutor's remarks did not go beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument. The prosecutor asserted Burke purchased gas at 7:48 p.m. and at 8:29 p.m. because "[Dahl] was positive that it was in fact the Defendant who purchased the gasoline on both occasions." Dahl actually testified the first gas purchase occurred "[b]etween 7:30, 7:45, in that area" and the second purchase occurred "approximately about an hour later." The prosecutor emphasized Dahl's indentification of Burke rather than her testimony regarding the times of the gas purchases and never directly asserted that Dahl testified to the exact times of the transactions. Moreover, the times the prosecutor advanced are consistent with the times Dahl testified to. The prosecutor's remarks therefore were fair and reasonable based on the evidence and were not improper.

[¶ 33] Because the prosecutor's questioning of Burke regarding Burke's drug use was not improper, the questions posed to Bockness regarding Burke's drug use did not affect Burke's substantial rights, and the prosecutor's timeline theory was not improper, Burke was not denied a fair trial because of prosecutorial misconduct.

## V

[¶ 34] Burke alleges he was denied his right to effective assistance of counsel. He emphasizes his attorney's failure to challenge the introduction of the DNA evidence; to call witnesses, particularly an expert witness to refute the state's DNA

evidence; to demand a speedy trial; and to object to improper questions.

[¶ 35] A claim of ineffective assistance of counsel at trial should not be brought on direct appeal, but rather through a petition for post-conviction relief. *DeCoteau v. State*, 1998 ND 199, ¶ 7, 586 N.W.2d 156. A post-conviction relief proceeding enables the parties to fully develop a record on the issue of counsel's performance and its impact on the defendant's case. *Id.* Claims of ineffective assistance of counsel are ordinarily unsuited to summary disposition without an evidentiary hearing. *Id.* However, when an ineffective assistance of counsel claim is asserted on direct appeal, we will examine the record to determine if the assistance of counsel was plainly defective. *State v. Sayler*, 443 N.W.2d 915, 918 (N.D.1989). If we cannot readily determine assistance of counsel was plainly defective and there are no other grounds for reversal, then the defendant can later pursue the claim at a post-conviction proceeding where an adequate record can be developed. *Id.*

[¶ 36] Ultimately, "[a] defendant alleging ineffective assistance of counsel has a heavy burden of proving counsel's assistance was ineffective by demonstrating (1) counsel's representation fell below an objective standard of reasonableness and (2) the defendant was prejudiced by counsel's deficient performance." *DeCoteau*, at ¶ 6. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Messner*, 1998 ND 151, ¶ 30, 583 N.W.2d 109. "The prejudice element requires the defendant to establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, and the defendant must point out with specificity how and where trial counsel was incompetent and the probable different result." *DeCoteau*, at ¶ 6.

[¶ 37] Here, the record does not show defense counsel's incompetence in not chal-

lenging the admission of the DNA evidence and in not calling an expert witness to refute the DNA evidence. No evidence supports Burke's assertion the DNA testing was not sufficiently reliable. Burke presents no valid basis upon which his attorney should have objected to or attacked the DNA evidence. We thus hold Burke failed to meet his burden of pointing out with specificity how defense counsel was incompetent in failing to object to the introduction of the DNA evidence and in failing to call an expert witness to refute the DNA evidence.

 [¶ 38] Burke's assertion defense counsel failed to demand a speedy trial is also without merit. Burke caused many of the delays in the proceedings. Burke made motions for commitment for a psychological evaluation, for public funds to hire an investigator, for a discovery deposition of Kathy Lorsung, and for public funds to acquire independent DNA testing. Burke's attorney conceded Burke was not ready for trial during status conferences in January, February, March, and April of 1998. Because Burke caused many of the trial delays, he could not have successfully asserted he was denied his right to a speedy trial. *See State v. Moe*, 1998 ND 137, ¶¶ 24–25, 581 N.W.2d 468 (noting the defendant caused much of the trial delay and concluding the defendant was not denied his right to a speedy trial). Defense counsel therefore did not err in failing to demand a speedy trial.

[¶ 39] Finally, Burke failed to show defense counsel's failure to object to allegedly improper questions was unreasonable and prejudicial. Burke specifically emphasizes the questions that were alleged prosecutorial misconduct. Burke failed to establish the questioning of Bockness regarding Burke's drug use affected Burke's substantial rights and ·was plain error; Burke has thus not established on this record he was prejudiced by counsel's performance. Defense counsel's failure to object to the questions therefore does not constitute ineffective assistance of counsel.

## VI

[¶ 40] Because we hold Burke failed to establish there was insufficient evidence to support his convictions, admission of the DNA evidence was obvious error, prosecutorial misconduct deprived him of a fair trial, and he was deprived of effective assistance of counsel, we affirm the judgment entered upon Burke's convictions.

[¶ 41] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, WILLIAM A. NEUMANN, DALE V. SANDSTROM, JJ., concur.