Filed 8/16/12 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2012 ND 169

Dale J. Burke, Petitioner and Appellant

v.

State of North Dakota, Respondent and Appellee

No. 20110286

Appeal from the District Court of Cass County, East Central Judicial District, the Honorable Steven L. Marquart, Judge.

AFFIRMED.

Opinion of the Court by Maring, Justice.

Nicholas Dwight Thornton, Fargo Public Defender Office, 912 3rd Avenue South, Fargo, N.D. 58103-1707, for petitioner and appellant.

Reid Alan Brady (appeared) and Mark Rainer Boening (on brief), Assistant State’s Attorneys, and Katherine Naumann (argued), third-year law student, under the Rule on Limited Practice of Law by Law Students, P.O. Box 2806, Fargo, N.D. 58108-2806, for respondent and appellee.

Burke v. State

No. 20110286

Maring, Justice.

[¶1] 
Dale Burke appeals from a judgment dismissing his application for post-

conviction relief after the district court denied his motion for DNA testing.  We hold the district court did not err in denying Burke’s request for DNA testing under N.D.C.C. § 29-32.1-15 and the court did not err in summarily denying his post-

conviction relief application.  We affirm.  

I

[¶2] In 1998, Burke was convicted of murdering Edmund Huotari and Larry Nelson and committing arson to conceal the bodies.  Burke appealed from the criminal judgment entered upon a jury verdict finding him guilty of two counts of murder and one count of arson.  

[¶3] In 
State v. Burke
, 2000 ND 25, ¶¶ 1, 40, 606 N.W.2d 108, this Court affirmed the criminal convictions, holding there was sufficient evidence to support the convictions, the admission of DNA evidence was not obvious error, Burke was not denied a fair trial because of prosecutorial misconduct, and Burke had failed to establish ineffective assistance of counsel.  In 
Burke
, we discussed relevant facts supporting the jury’s convictions:

At approximately 9:45 p.m. on April 27, 1997, Fargo firefighters responded to a report of a fire at the home of Larry Nelson and Edmund Huotari.  The firefighters found the home in flames and, later, the bodies of Nelson and Huotari inside.  A medical examiner concluded they both died from being repeatedly struck in the head with a blunt object.

Fargo police suspected Burke killed Nelson and Huotari and set the home on fire to conceal the killings.  On April 29, 1997, an Information was filed charging Burke with two counts of murder and one count of arson.  The next day, Burke was arrested in Seward, Nebraska at the residence of Jan Thomas, Burke’s former girlfriend.  Thomas gave some of Burke’s clothing, including a pair of blood-stained blue jeans, to Officer Hoag, one of the arresting officers. 

. . . .

A jury trial began on July 7, 1998.  The State presented the pair of blue jeans and an expert who performed polymerase chain reaction [PCR] DNA testing on them.  The expert testified that statistically 1 in 17,000 white persons would have DNA that matched the DNA in the blood on the jeans and Huotari’s DNA matched the DNA in the blood on the jeans.

Gary Bockness testified he and Burke had a conversation a few days before the killings.  Bockness asserted Burke said he planned to kill Huotari and blame Bockness.  Bockness also testified he himself had an ongoing feud with Huotari.  Bockness conceded that during his deposition he had stated Burke said he planned to kill not only Huotari but Nelson as well.

Jeneen Dahl, a gas station attendant, testified regarding two gas purchases by Burke on the night of the crimes.  She indicated Burke purchased $1.85 in gas at about 7:30 or 7:45 p.m. and $10.00 in gas about one hour later.

Other witnesses testified Burke was at Huotari and Nelson’s home shortly before the fire.  David Myles said he saw Burke leave the residence at about 8:30 p.m. and return ten to fifteen minutes later.  Myles also stated he later saw Burke near Burke’s car. Darrin Peterson testified that at 9:08 p.m., Burke called the Peterson residence from Huotari and Nelson’s home.

Burke testified on his own behalf.  He said he had moved in with Nelson and Huotari about three weeks before the crimes.  Burke asserted Huotari had cut himself when the two were installing carpet and Huotari’s blood got on Burke’s jeans at that time.  Burke testified he had left town on the night of the killings and the fire because he panicked, thinking he had accidentally started the fire by putting a penny behind a fuse.  During cross-examination, the prosecutor questioned Burke about his drug use, and Burke admitted he had used drugs in the past.  The prosecutor also questioned Burke about his statements to a police detective shortly after his arrest.

 

Burke
, 2000 ND 25, ¶¶ 2-10, 606 N.W.2d 108.

[¶4] In 2000, Burke filed an application for post-conviction relief, which the district court denied.  On appeal, this Court summarily affirmed the district court’s denial in 
Burke v. State
, 2002 ND 18, 642 N.W.2d 532.  In 2005, Burke filed a second post-

conviction relief application, which the district court also denied.  Burke also appealed from that denial of post-conviction relief, but this Court subsequently dismissed his appeal for failure to file a brief.

[¶5] In April 2011, Burke filed this application for present post-conviction relief, seeking additional DNA testing and reversal of his conviction and asserting his actual innocence.  Burke asserted that in testifying at trial, he got confused and misspoke in saying the blood on the jeans was Huotari’s blood.  Burke contended he meant to testify “it was possible that the blood could have been Huotari’s.”  Burke also stated, “that he does not believe the blood on the blue jean[s] is that of Edmund Huotari[.]”  Burke also sought further discovery and DNA testing, in essence seeking short tandem repeat (“STR”) DNA testing on the blood-stained jeans.  He contended the testing was not available as evidence at the time of trial, the evidence to be tested had been in the custody of the clerk of court, and the requested testing would “produce new and noncumulative evidence materially relevant to [Burke’s] assertion of actual innocence.”  The State answered and moved to dismiss Burke’s application and motions.

[¶6] Before a September 2011 hearing, Burke submitted supporting affidavits from Dr. William Massello III, the North Dakota State Forensic Examiner; Kathy Ouren, the Cass County Clerk of District Court; and Thomas Wahl, a forensic DNA expert.  In his affidavit, Dr. Massello stated that his office had conducted the autopsy on Huotari and had obtained and securely stored samples of Huotari’s blood, which is available for comparison DNA testing.  Ouren stated in her affidavit that her office had securely stored Burke’s blood-stained blue jeans after the trial.

[¶7] Further, expert forensic DNA consultant Wahl, in his affidavit, discussed modern standards for DNA testing, including short tandem repeat (“STR”) DNA testing.  Wahl indicated the testing Burke requested was not available at the time of trial “because the forensic application of this technology had not yet been fully developed, validated or implemented.”  Wahl stated in his report that the “extreme discriminating power of the STR genetic profiling systems offers a better chance of excluding an individual as the source of the evidence relative to the PM & DQA1 genetic profiling system.”  Wahl also stated in his affidavit, “[t]here have been cases in which individuals have matched questioned DNA profiles with older DNA profiling systems who were subsequently excluded using the newer, more powerful STR profiling systems. . . .”  Wahl opined that there was scientific potential to produce new, noncumulative evidence if the blood-stained pants were subjected to the new STR DNA testing, and he also described STR DNA profiling as being the generally-accepted DNA testing method in the scientific community worldwide.

[¶8] After the hearing, the district court denied Burke’s motions for DNA testing and summarily dismissed his post-conviction relief application.  The court held the items Burke sought to have tested had already been subjected to forensic DNA testing.  The court held “the evidence was subject to testing because the technology for the testing was available at the time of the trial and the testing was available as evidence at the time of the trial.”  The court further held “it does not matter that the new DNA testing might be more accurate than the 1 in 17,000 accuracy of the test that was done.  The accuracy of the test that was done, together with Burke’s admission that the blood on his jeans was Huotari’s, makes the testing done reliable.”  The court further concluded Burke’s motion failed because there was no showing the new testing would be “materially relevant” to Burke’s “actual innocence” assertion.

II

[¶9] Burke argues that, before the district court could rule on his post-conviction relief application, he was entitled to DNA retesting of the blood on his blue jeans used in his criminal prosecution.  He argues the court erred in denying his motion for DNA testing and in summarily dismissing his application.  He contends the district court should have granted his DNA testing motion under N.D.C.C. § 29-32.1-15 and should have held an evidentiary hearing on his application for post-conviction relief upon return of the DNA results.

[¶10] Post-conviction relief proceedings are civil in nature and are governed by the North Dakota Rules of Civil Procedure.  
Olson v. State
, 2008 ND 113, ¶ 9, 750 N.W.2d 459; 
Wheeler v. State
, 2008 ND 109, ¶ 5, 750 N.W.2d 446.  A petitioner for post-conviction relief has the burden of establishing the grounds for relief.  
Olson
, at ¶ 9; 
Wheeler
, at ¶ 5.  This Court has explained:

“A district court may summarily dismiss an application for post-conviction relief if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  N.D.C.C. § 29-32.1-09(1); 
Johnson v. State
, 2006 ND 122, ¶ 19, 714 N.W.2d 832; 
Heyen v. State
, 2001 ND 126, ¶ 6, 630 N.W.2d 56.  We review an appeal from summary denial of post-conviction relief as we would review an appeal from a summary judgment.  
Johnson
, at ¶ 19; 
Heyen
, at ¶ 6.  The party opposing the motion for summary dismissal is entitled to all reasonable inferences to be drawn from the evidence and is entitled to an evidentiary hearing if a reasonable inference raises a genuine issue of material fact.  
Heyen
, at ¶ 6.  For summary judgment purposes, the evidentiary assertions of the party opposing the motion are assumed to be true.  
Dinger v. Strata Corp.
, 2000 ND 41, ¶ 14, 607 N.W.2d 886.”

 

Wheeler
, at ¶ 5 (quoting 
Sambursky v. State
, 2006 ND 223, ¶ 7, 723 N.W.2d 524).  “[T]he party moving for summary dismissal has the initial burden of showing there is no genuine issue of material fact.”  
Wheeler
, at ¶ 5.  “If the party moving for summary dismissal shows the absence of a genuine material fact issue, the burden then shifts to the responding party to demonstrate the existence of a genuine issue of material fact.”  
Id.
  “‘The party opposing the motion may not merely rely upon the pleadings or upon unsupported, conclusory allegations, but must present competent admissible evidence by affidavit or other comparable means which raises an issue of material fact.’”  
Id.
 (quoting 
Owens v. State
, 1998 ND 106, ¶ 13, 578 N.W.2d 542).

[¶11] Section 29-32.1-15, N.D.C.C., adopted in 2005, provides a post-conviction relief procedure to obtain DNA testing not available at trial:

1. Without limitation on a court’s authority to order discovery under section 29-32.1-08, a person convicted of a crime may make a motion for the performance of forensic DNA testing to demonstrate the person’s actual innocence if:

a. The testing is to be performed on evidence secured in relation to the trial which resulted in the conviction; and

b. 
The evidence was not subject to the testing because either the technology for the testing was not available at the time of the trial or the testing was not available as evidence at the time of the trial
.

2. A person who makes a motion under subsection 1 must present a prima facie case that:

a. Identity was an issue in the trial; and

b. The evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect.

3. The court 
shall
 order that the testing be performed if:

a. A prima facie case has been established under subsection 2; 

b. 
The testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant’s assertion of actual innocence
; and

c. The testing requested employs a scientific method generally accepted within the relevant scientific community.  The court shall impose reasonable conditions on the testing designed to protect the state’s interests in the integrity of the evidence and the testing process.

 

(Emphasis added.)  Whether a prima facie case has been established under N.D.C.C. § 29-32.1-15 presents a question of law.  
Olson
, 2008 ND 113, ¶ 9, 750 N.W.2d 459.  Questions of law are fully reviewable on appeal.  
Id.
  

A

[¶12] Burke makes two arguments under N.D.C.C. § 29-32.1-15.  First, he argues the district court’s interpretation of N.D.C.C. § 29-32.1-15(1)(b), in deciding whether “the technology for the testing was not available at the time of the trial,” was unduly narrow in construing what the legislature meant by the phrase “the testing.”  Second, he argues that under N.D.C.C. § 29-32.1-15(3)(b), if the more accurate DNA test produces a favorable result, his assertion of innocence is supportable because it has the “scientific potential to produce new, noncumulative evidence” and thus is “materially relevant.”

[¶13] Regarding his first argument, Burke argues that although the blood stain on his pants was subjected to “rudimentary PCR DNA analysis” in 1998, the blood-stained pants have not been “tested” because they were not subjected to the specific STR DNA test he has requested.  Burke argues a plain reading of N.D.C.C. § 29-32.1-

15(1)(b) allows the court to order specific DNA testing that either was not performed because it did not exist or that was not available as evidence at the time of trial.  Burke argues that while there was DNA testing in his 1998 trial, it is not the DNA testing he has requested in 2011.  Assuming, without deciding, that under N.D.C.C. § 29-32.1-15(1)(b) Burke is entitled to retesting of the blood-stained jeans under newer, more accurate DNA testing techniques presently available, we believe the issues he raises in his arguments under N.D.C.C. § 29-32.1-15(3) are nonetheless dispositive.

B

[¶14] Burke argues the district court misinterpreted and misapplied N.D.C.C. § 29-

32.1-15(3) when it focused only on “material relevance,” rather than the phrase “potential to produce new, noncumulative evidence materially relevant to the defendant’s assertion of actual innocence.”  Burke contends he established a prima facie case under N.D.C.C. § 29-32.1-15(2) because the DNA testing played a significant role at trial and linked Burke to Huotari’s blood and his death.  Burke also asserts he adequately established the chain of custody for the blood-stained pants and Huotari’s known biological comparison sample with the State Forensic Examiner’s office.  

[¶15] Burke asserts that he produced evidence that the specific testing requested had the scientific potential to produce new, noncumulative evidence that is materially relevant to the assertion of actual innocence.  Burke contends that if the specific testing requested has the scientific potential to exclude Huotari as the source of the blood on Burke’s pants it would be materially relevant to Burke’s claim of actual innocence, making it more likely that his assertion of actual innocence is true.  Burke argues the court erred in summarily dismissing his post-conviction relief application before affording him the opportunity to obtain the DNA testing he requested.  Burke contends he is entitled to DNA testing on his blood-stained pants and the court effectively eliminated his ability to respond to the State’s summary dismissal motion.

[¶16] The State responds, however, that the phrase, “potential to produce new, noncumulative evidence materially relevant to the defendant’s assertion of actual innocence,” under N.D.C.C. § 29-32.1-15(3)(b) should be construed in a practical manner.  The State argues whether Huotari’s blood was on Burke’s jeans was irrelevant to his assertion of innocence because Burke testified at trial that Huotari’s blood got on his jeans innocently when Huotari accidentally cut himself while they were installing carpet.  The State argues Burke made a tactical decision at trial by admitting the blood was Huotari’s and offering an innocent explanation.  The State asserts interpreting N.D.C.C. § 29-32.1-15(3)(b) to include Burke’s previous specific assertions prevents him from benefitting from his “manipulation.”  The State also argues the court considered the evidence presented at trial, aside from the DNA testing, and concluded it implicated only Burke.  The State contends testing would neither exonerate Burke, nor demonstrate his actual innocence.

[¶17] Here, based on his district court submissions, we believe Burke established a prima facie case under N.D.C.C. § 29-32.1-15(2), in that identity was an issue in the trial and the evidence to be tested has been subject to a sufficient chain of custody.  Nonetheless, under N.D.C.C. § 29-32.1-15(3)(b), Burke must also establish “the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant’s assertion of actual innocence.”  

[¶18] “The interpretation of a statute is a fully reviewable question of law, ‘and our primary objective is to ascertain the intent of the legislature by looking at the language of the statute itself and giving it its plain, ordinary and commonly understood meaning.  Consideration should be given to the context of the statutes and the purposes for which they were enacted.’”  
Falcon v. State
, 1997 ND 200, ¶ 9, 570 N.W.2d 719 (quoting 
Van Klootwyk v. Arman
, 477 N.W.2d 590, 591-92 (N.D. 1991) (citations omitted)).  

[¶19] We initially note that the statutory language of N.D.C.C. § 29-32.1-15(3)(b) is similar to language adopted in Illinois.  
See
 725 Ill. Comp. Stat. 5/116-3 (West 1998).  Although we have not previously addressed the meaning of “materially relevant” under N.D.C.C. § 29-32.1-15(3)(b), other courts have 
held that evidence that is “materially relevant” to a defendant’s claim of actual innocence is evidence which “tends to significantly advance that claim.”  
People v. Savory
, 756 N.E.2d 804, 810-11 (Ill. 2001); 
see also
 
Johnson v. State
, 157 S.W.3d 151, 161 (Ark. 2004).  In deciding whether evidence is “materially relevant,” a court must consider the exculpatory potential of a favorable DNA result, in addition to the other evidence presented at trial.  
Savory
, at 811.

[¶20] In 
Savory
, 756 N.E.2d at 810-11, the Illinois Supreme Court explained that “evidence which is ‘materially relevant’ to a defendant’s claim of actual innocence is simply evidence which tends to significantly advance that claim.”  The court said the question of whether evidence is “materially relevant to the defendant’s assertion of actual innocence” could not be determined in the abstract, but required “consideration of the evidence introduced at trial, as well as an assessment of the evidence defendant is seeking to test.”  
Id.
 at 811.  The court held the evidence the defendant sought to test was not “materially relevant” to his claim of actual innocence, after reviewing the transcript of the defendant’s second trial.  
Id.
  The bloodstain evidence at issue was essentially a “collateral issue” at trial and not central to the State’s evidence of guilt.  
Id.
  The court concluded that a test result favorable to the defendant would not have significantly advanced his claim of actual innocence, “but would only exclude one relatively minor item from the evidence of guilt marshaled against him by the State.”  
Id.
 at 811-12.  
See also
 
People v. Gecht
, 899 N.E.2d 448, 454 (Ill. App. Ct. 2008) (“[B]iological evidence played no significant role in defendant’s trial and the evidence of defendant’s guilt is overwhelming.”).

[¶21] In this case, even assuming the requested STR DNA analysis result is favorable to Burke and ultimately excludes Huotari as the source of the blood on Burke’s jeans, we hold this would not “significantly advance” Burke’s claim of actual innocence in light of the evidence presented to the jury.  The DNA testing result presented at Burke’s trial, which did not preclude Huotari as the source of the blood on the jeans, was only a part of the evidence presented.  There was significant other evidence presented at trial tying Burke to the crime scene.  Gary Bockness testified he and Burke had a conversation a few days before the murders 
in which Burke said he planned to kill Huotari and blame Bockness.  Bockness conceded at trial Burke said he planned to kill not only Huotari but also Nelson.  The gas station attendant testified regarding Burke’s two gas purchases on the night of the crime.  Other witnesses testified Burke was at Huotari and Nelson’s home shortly before the fire.  David Myles testified he saw Burke leave the residence at about 8:30 p.m. and return ten to fifteen minutes later and later saw Burke near Burke’s car.  Another witness testified that at 9:08 p.m. Burke called the Peterson residence from Huotari and Nelson’s home.  Burke was arrested in Seward, Nebraska, a few days after the deaths and fire.  His former girlfriend gave law enforcement the blood-stained blue jeans.  There is also evidence Burke gave conflicting accounts of why he had left town, including his testimony that he had discovered the house in flames, thought he had caused the fire by placing a penny behind a fuse, and “just panicked and just-just left.”

[¶22] In requesting DNA retesting, Burke seeks to recant his clear and unequivocal sworn testimony at trial that the blood found on his pants was Huotari’s blood.  During his direct examination at the murder trial, Burke testified:

Q.  Anything unusual happen when you laid the carpet down?

A.  Yeah.  Ed—Ed had a—they got these carpet knives and they got these double edge blades that are about that long (indicating) and he had one somebody had left somewheres.  He was always scrapin’ stuff, you know. And the blade didn’t exactly fit in it. And he was—I was holding a piece of carpet for him and he was cuttin’ it and the blade come back and cut him on the hand.

I don’t really remember where but he cussed me and told me out.  “Move the damn carpet,” cut himself.  He was kind of cantankerous like that, you know.  But I remember he’d cut himself pretty good because those carpet blades were real sharp.

Q.  Did you get any blood on you?

A.  I think so.  I think I got some—I got some—I got some blood off of the carpet on me, you know.  I got it on a pair of pants over here (indicating).

 

Additionally, during cross-examination, Burke testified:

Q.  So was Jan Thomas’ testimony accurate or inaccurate with regard to the blood that she saw on your blue jeans when you arrived in Seward, Nebraska?

A.  It was inaccurate.

Q.  What way was it inaccurate?

A.  The size of the stain.  If you would have been doin’ your job you would have found out I never denied the blood stain in the first place and you would have never have spent the state’s money on expensive DNA testing.

I said from the onset whose blood it was and everything.  You’re the one that tried to make something out of it.

Q.  So you admit that Edmund Huotari’s blood was on your blue jeans when you arrived in Seward, Nebraska; is that correct?

A.  Yeah, yeah.  Yeah, that was—that was his.  Definitely, that was definitely his blood.  That was the only place that I could have gotten the blood from.  I thought it might have come from another source.  But when I looked back in retrospect I said, “Yeah—“ I said, “Yeah, that’s—” I thought to myself, “Yup, that’s,” you know, “they’re going to try to make something out of that,” because I, you know, I had remembered when Ed cut himself.

Q.  Why did you attempt to wash the blood off your blue jeans when you were staying with Jan Thomas?

A.  Well, isn’t it—isn’t it customary when one washes their clothes if they see a stain on their—on the clothes that they’re washing, if you had a stain on your pants would you not try to put something on it to remove it?

Q.  Why did you use carpet cleaner?

A.  Because that was all she had.  Because carpet cleaner’s—carpet cleaner’s usually a good thing to get stuff out with, you know.  I had grease on it.  You can usually get grease out of a pair of jeans with carpet cleaner and, you know,—(No further response.)  

 

[¶23] Based upon our review of the record, we conclude that the district court did not err in concluding the proposed DNA testing is not “materially relevant” to Burke’s claim of actual innocence as it would not tend to significantly advance his claim.  We further conclude that Burke failed to raise a genuine issue of material fact precluding summary dismissal of his application for post-conviction relief.  We therefore conclude the district court did not err in dismissing Burke’s motions and application for post-conviction relief.

III

[¶24] We have considered Burke’s remaining arguments and deem them to be without merit or unnecessary to our opinion.  The judgment is affirmed.

[¶25] Mary Muehlen Maring

Daniel J. Crothers

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.

Sandstrom, Justice, concurring specially.

[¶26] Although I agree with much of the majority opinion, I do not agree that “identity” under N.D.C.C. § 29-32.1-15(2) was an issue that went to the jury at trial.  Burke himself had testified at trial that the blood on his jeans was that of the deceased Huotari.

[¶27] I agree that the action of the district court should be affirmed.

[¶28] Dale V. Sandstrom