2007 ND 125

**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Dennis James GAEDE, Defendant and Appellant.**

No. 20060188.

Supreme Court of North Dakota.

July 25, 2007.

Mark Rainer Boening, Assistant State's Attorney, Fargo, N.D., for plaintiff and appellee.

William Kirschner, Fargo, N.D., for defendant and appellant.

SANDSTROM, Justice.

[¶ 1] Dennis James Gaede appeals from a criminal judgment entered after a jury found him guilty of murder. We affirm, concluding there was sufficient corroborating evidence to support the verdict, the district court did not err in admitting testimony about Gaede's post-arrest statements, the court did not abuse its discretion in admitting evidence about Gaede's convictions, and the court did not have a duty to inquire whether Gaede knowingly and voluntarily waived his right to testify.

I

[¶ 2] The State charged Gaede with intentionally or knowingly killing Timothy Wicks on December 28, 2001, at Gaede's residence in Gardner, North Dakota. The State's theory of the case was that Gaede moved to North Dakota from Milwaukee, Wisconsin, in the summer of 2001 to avoid going to prison in Wisconsin, and he assumed the identity of Wicks, a person for whom Gaede had prepared taxes in Wisconsin. The State asserted Gaede made plans for Wicks to travel from Wisconsin to North Dakota under the pretext of playing a "music gig" in Canada, and Gaede subsequently shot Wicks in the kitchen of Gaede's home in Gardner. The State claimed Gaede and his wife, Diana Fruge, cleaned the kitchen and eventually transported Wicks' body to Michigan in a U–Haul truck, where Gaede dismembered the body and separately disposed of the torso, head, and hands. The State presented evidence that Gaede and Fruge then returned to the Fargo area and shortly thereafter went to the Milwaukee area where Gaede withdrew money from Wicks' bank accounts and purchased an RV that he and Fruge used to travel around the country until they were arrested in Nebraska in March 2002.

[¶ 3] At trial, Fruge testified she had married Gaede in May 2001, and in July 2001, Gaede was convicted of "some felonies" in Wisconsin. Fruge testified Gaede told her that he did not want to go to prison for those felonies and if they moved

to another state, he could assume another identity and start a new life. Gaede and Fruge moved from Wisconsin to North Dakota, where Gaede assumed Wicks' identity and began working in Fargo as a bookkeeper and bought a house in Gardner using Wicks' identity. Gaede also got a North Dakota drivers' license in Wicks' name. There was evidence Gaede had met Wicks in Milwaukee, where Gaede had prepared Wicks' taxes. Sometime in late December 2001, Gaede's employer discovered that Gaede, who was known to the employer as Wicks, had stolen money from the business. Fruge testified Gaede called Wicks sometime in December 2001, after which Gaede told her that Wicks had found out someone was using one of his credit cards. She also testified Gaede had told her that he wanted to take Wicks to Canada to play a "music gig" and he might have to kill Wicks.

[¶ 4] On December 24, 2001, Wicks told his brother-in-law that he and Gaede were going to Canada "to get a job doing his jazz drumming" and Gaede wanted it to be a "big secret." On December 25, 2001, Wicks told his landlord that he and a friend were going to Canada to play a "band gig," and Wicks left a card with the landlord which said "Dennis & Tim Wicks" with a telephone number. Fruge testified that she and Gaede visited Milwaukee in late December 2001, and they returned to North Dakota in their vehicle. She also testified Wicks followed them to North Dakota in his vehicle and stayed at Gaede's house in Gardner.

[¶ 5] According to Fruge, on the night of December 28, Gaede and Wicks had been drinking beer and smoking marijuana in the basement of Gaede's house in Gardner when she went upstairs to put her son to sleep and she also fell asleep. Fruge testified she was sleeping in an upstairs bedroom when Gaede woke her and told

her to come downstairs. According to Fruge, she went downstairs and found Wicks laying on the floor between a foyer and the kitchen. Fruge testified Gaede told her that he had shot Wicks. According to Fruge, Gaede and Fruge subsequently moved Wicks' body to a barn and cleaned the kitchen. Fruge testified that on December 29, 2001, Gaede used Wicks' credit card and rented some equipment to dig a hole next to the Gardner house to try to bury Wicks' body, but the ground was too frozen to bury the body. Gaede's employer testified that on December 29, Gaede called him at home and asked to use one of the company's service pickups to haul a trailer because Gaede wanted to rent a Bobcat. Gaede's employer did not authorize him to use a pickup, and the State presented evidence that Gaede rented a backhoe to try to bury Wicks' body near the house in Gardner, but the ground was too frozen to bury the body. On December 30, Gaede used Wicks' credit card to purchase several items at Fleet Farm in Fargo. On December 30, Gaede also used Wicks' credit card to rent a U-Haul truck in Fargo, which was driven 1,786 miles and returned to Fargo on January 4, 2002. Fruge testified she helped Gaede put Wicks' body in the back of the U-Haul in wardrobe boxes, they left Fargo on December 31, looking for a place to dispose of Wicks' body, and they drove to Iron Mountain, Michigan, where they purchased diesel for the truck using Wicks' credit card. Fruge testified that Gaede dismembered Wicks' body near Powers, Michigan, and she helped Gaede throw the torso in a ditch on January 1, 2002.

[¶ 6] On January 2, 2002, after Gaede had failed to appear at work in Fargo for several days, his employer called the Cass County Sheriff to go to Gaede's house for a "welfare check." A deputy sheriff observed Wicks' car at the residence and left a note about the "welfare check" in the

house. On January 2, 2002, Wicks' torso was found in Michigan near a bridge over the Menominee River. The head and the hands had been severed from Wicks' body. According to Fruge, Gaede and Fruge returned the U-Haul to Fargo on January 4, 2002, and a few days later, after discovering the note from a Cass County deputy sheriff in the house in Gardner, they went to Milwaukee, where Gaede withdrew money from Wicks' bank accounts. Fruge testified that on the trip to Milwaukee, Gaede disassembled the handgun used to kill Wicks and had Fruge throw it into Lake Michigan. According to Fruge, they used Wicks' money to purchase an RV and traveled around the country. On January 16, 2002, Wicks' head was discovered in the Menominee River about 12 miles from where the torso was found.

[¶ 7] Gaede and Fruge were arrested in Nebraska in March 2002. Fruge initially made statements to several different individuals that indicated she had shot Wicks, but Fruge testified she made those statements because she and Gaede had concocted a plan whereby she would say she killed Wicks after he had raped her. Gaede did not testify at trial, but claimed Fruge shot Wicks and his only involvement was to help cover up the killing. A jury found Gaede guilty of murder, and he was sentenced to life imprisonment without parole.

[¶ 8] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. This appeal is timely under N.D.R.App.P. 4(b). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 29–28–06.

II

■ [¶ 9] Gaede argues there was insufficient evidence to support his conviction because Fruge's testimony was not corroborated. Gaede claims Fruge was an accomplice and her testimony was not corroborated under N.D.C.C. § 29–21–14, which provides:

A conviction cannot be had upon the testimony of an accomplice unless the accomplice is corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof.

[¶ 10] Gaede asserts the independent evidence after Wicks' death is equally as capable of proving Gaede was merely helping to cover up Fruge's crime as it is of proving he shot Wicks. Gaede claims that because Fruge was shown to be a dishonest person and a liar and because she confessed to the shooting, the evidence is insufficient to convict him of murder. The district court decided not to give an instruction requiring corroboration of the testimony of an accomplice, and Gaede did not object to the court's decision. The State thus claims Gaede failed to raise this issue in the district court and cannot now argue that corroboration of Fruge's testimony was necessary. The State also argues Fruge's testimony was corroborated in many important regards and there was sufficient evidence to support the conviction.

■ [¶ 11] "The purpose of corroborative evidence is to show that a testifying accomplice is a reliable witness and worthy of credit." *State v. Zimmerman*, 524 N.W.2d 111, 114 (N.D.1994); *State v. Hogie*, 454 N.W.2d 501, 503 (N.D.1990); *State v. Haugen*, 448 N.W.2d 191, 194 (N.D. 1989). In *State v. Pacheco*, 506 N.W.2d 408, 409 (N.D.1993), this Court said N.D.C.C. § 29–21–14 requires corroboration when a witness could be criminally responsible as an accomplice under N.D.C.C. § 12.1–03–01(1), which defines an accomplice as:

A person may be convicted of an offense based upon the conduct of another person when:

a. Acting with the kind of culpability required for the offense, he causes the other to engage in such conduct;

b. With intent that an offense be committed, he commands, induces, procures, or aids the other to commit it, or, having a statutory duty to prevent its commission, he fails to make proper effort to do so; or

c. He is a coconspirator and his association with the offense meets the requirements of either of the other subdivisions of this subsection.

A person is not liable under this subsection for the conduct of another person when he is either expressly or by implication made not accountable for such conduct by the statute defining the offense or related provisions because he is a victim of the offense or otherwise.

■■■ [¶ 12] In assessing whether a witness is an accomplice, this Court has said if the facts as to the witness's culpability are disputed or susceptible of different inferences, the decision is a question of fact, but if the facts as to the witness's culpability are neither disputed nor susceptible of different inferences, the decision is a question of law. *State v. Kelley*, 450 N.W.2d 729, 731 (N.D.1990); *State v. Thorson*, 264 N.W.2d 441, 442–43 (N.D. 1978). Mere presence at the scene of a crime is not enough to make one an accomplice; however, presence at the scene of a crime, together with other facts, may support a finding that a person is an accomplice. *Kelley*, at 732; *State v. Bonner*, 361 N.W.2d 605, 612–13 (N.D.1985).

[¶ 13] In *Haugen*, 448 N.W.2d at 194–95 (citations omitted), this Court discussed the type of evidence necessary for corroboration:

[U]nder Section 29–21–14 it is not necessary to corroborate every fact testified to by an accomplice. All that is required is that the evidence, circumstantial or otherwise, corroborate the testimony of an accomplice as to some material fact or facts, and tends to connect the defendant with the commission of the crime. It is not necessary that the corroborating evidence be sufficient, in itself, to warrant a conviction or establish a prima facie case. Furthermore, the State need not point to a single isolated fact which is sufficient corroboration, as it is the combined and cumulative weight of the evidence other than the testimony of the accomplice witness which satisfies the statute. In cases involving the use of corroborative evidence, it is incumbent upon the trial court to first determine, as a matter of law, whether or not there is any evidence corroborating the testimony of the accomplice, and only after the court has found such corroborative evidence is it allowed to leave the question of the sufficiency of the corroborative evidence to the jury.

. . .

"The corroboration [of an accomplice's testimony] need not directly link the accused to the crime." Rather, corroboration merely requires that there be evidence *"tending to connect the defendant with the offense committed."* Indeed, the language of Section 29–21–14 requires only corroborative evidence which "tends to connect" a defendant with the commission of an offense.

[¶ 14] In *Kelley*, 450 N.W.2d at 730–31, there was disparate testimony about the trigger person for a shooting, and the district court refused to give the defendant's requested corroboration instruction. An opinion written by former Chief Justice Erickstad and concurred in the result by

one other justice said an accomplice instruction was not warranted, and even if warranted, any error in failing to give the instruction was harmless because it could not have had a significant impact upon the verdict. *Id.* at 732–33. An opinion by then Justice VandeWalle and concurred in by three other justices concluded a corroboration instruction should have been given, but the failure to give the instruction was harmless because there was sufficient corroborating evidence tending to connect the defendant with the commission of the murder. *Id.* at 733–34.

[¶ 15] Here, we conclude the error, if any, in not giving a corroboration instruction was harmless because there was sufficient evidence that is corroborative of Fruge's testimony. There is circumstantial evidence of events before the actual shooting that tends to corroborate Fruge's testimony, including that Gaede had been using Wicks' name in his employment in Fargo, that Wicks' car was at the Gardner home, that Gaede had procured a North Dakota drivers' license in Wicks' name, and that the Gardner home was bought in Wicks' name. That evidence demonstrates a motive for Gaede to kill Wicks and tends to connect Gaede with the shooting. Moreover, there is independent evidence of the circumstances surrounding the disposal of Wicks' body that also tends to connect Gaede with the shooting and corroborates Fruge's testimony. That independent evidence includes Gaede's use of Wicks' credit card to rent equipment to dig a hole next to the Gardner house, Gaede's telephone conversation with his employer to borrow one of the company's service pickups, the marks in the frozen ground near the Gardner house, Gaede's use of Wicks' credit card to purchase items at Fleet Farm in Fargo, Gaede's use of Wicks' credit card to rent the U–Haul in Fargo and purchase fuel in Iron Mountain, Michigan, and the discovery of Wicks' dis-

membered body. Although there was no independent and direct evidence about the actual trigger person for Wicks' death, the combined and cumulative effect of the other independent evidence tends to connect Gaede to the murder and corroborates Fruge's testimony. We conclude there is sufficient evidence to corroborate Fruge's testimony, and the error, if any, in failing to give a corroboration instruction was harmless under the rationale of *Kelley.*

### III

[¶ 16] Gaede argues he was denied a fair trial because the district court allowed the State to introduce testimony about statements made by him after his arrest. Gaede argues that testimony violated his right to remain silent.

[¶ 17] At trial, Gaede initially called Sherri Cotter, a correctional specialist in Nebraska, to testify about Fruge's statements and reaction to a newspaper article, which were made shortly after the couple's arrest in Nebraska. Cotter testified her interview of Fruge was to gauge how she was coping with confinement. Cotter testified she informed Fruge that she was a correction officer, that Fruge should not discuss any of the particulars of the case with her, and that anything Fruge had to say regarding the case should be discussed with an attorney. Cotter testified she provided Fruge with a newspaper article about the couple's arrest, and Fruge said "I did it; he didn't." The State thereafter called Cotter to testify in rebuttal about Cotter's interview with Gaede. Cotter testified her interview with Gaede was also to see how he was coping with confinement, and she followed the same procedure she used for her interview with Fruge. Cotter testified:

Q. What was the Defendant's-this Defendant's response, Dennis Gaede's response, when you did the same thing

with him that you did with Diana [Fruge]?

A. Essentially, he was calm and didn't give much of a reaction. Indicated that he—

[DEFENSE COUNSEL]: Objection, hearsay.

THE COURT: Overruled.

Q. (By Mr. Boening) Go ahead.

A. Indicated that he knew about the person stated in the article.

Q. Did he ask about what he was being charged with?

A. No, he did not.

Q. So he never asked you any questions about being charged with the murder?

A. No.

Q. That of course was what was being discussed in the newspaper article, the fact that he was suspected of being responsible for a murder; is that correct?

A. Correct.

Q. Did you find that unusual as part of your observation of-of inmates who are brought into jail that when you confront them with a newspaper article alleging that they're involved in a murder, you confront them with that, that they have no reaction to that?

A. His only reaction was that he didn't commit the crime.

Q. And what crime was he referring to?

A. Well, I would image the crime in the article which was essentially about the murder that he was being accused of.

Gaede argues Cotter's testimony was an unconstitutional comment about his post-arrest silence.

[¶ 18] Testimony or argument about a defendant's post-arrest silence may constitute an improper comment about a defendant's invocation of the right to remain silent. *State v. Hill*, 1999 ND 26, ¶ 16, 590 N.W.2d 187; *City of Williston v. Hegstad*, 1997 ND 56, ¶ 9, 562 N.W.2d 91; *State v. Schneider*, 270 N.W.2d 787, 792 (N.D.1978); *State v. Carmody*, 253 N.W.2d 415, 417–18 (N.D.1977); *State v. Bragg*, 221 N.W.2d 793, 799–801 (N.D. 1974). Improper comment about a defendant's invocation of the right to remain silent is a constitutional error that may be reviewed on appeal even though not raised at trial. *Hill*, at ¶ 16; *Schneider*, at 792. In *Hill*, at ¶ 17 (quoting *State v. Janda*, 397 N.W.2d 59, 66 (N.D.1986)), we outlined the following factors for deciding whether improper comment about a defendant's post-arrest silence was harmless error:

1. The use to which the prosecution puts the post arrest silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference.

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.

[¶ 19] Here, Cotter's testimony does not unequivocally demonstrate an improper comment about Gaede's post-arrest silence, nor does this record reflect a *Miranda* violation. Moreover, the court gave the following jury instruction:

Testimony has been received in this case concerning certain statements made by the Defendant out-of-court and before trial as to the Defendant's involvement in the commission of the crime charged.

In determining the weight, if any, to be given an out-of-court statement by

the Defendant, you should consider all the evidence of the circumstances under which the statement was made.

On this record and under the relevant factors outlined in *Hill*, assuming Cotter's testimony could be construed as a comment about post-arrest silence, we do not believe that testimony about Gaede's effective denial of involvement in the murder was prejudicial to him or could have affected the outcome of the proceeding. We therefore conclude the court did not err in admitting Cotter's testimony.

## IV

[¶ 20] Gaede argues he was denied a fair trial because the district court allowed the State to introduce evidence of his convictions in Wisconsin and in North Dakota. Gaede argues the evidence of his North Dakota convictions for theft, theft of property, and embezzlement and his Wisconsin conviction were used to show he was a bad person.

[¶ 21] Before trial, the State notified Gaede that it intended to offer:

1) evidence of the fact that Dennis Gaede represented himself to be Timothy Wicks before and after Wicks' head was found on 2 January 2002, and, 2) evidence of the fact that Gaede used Wicks' credit card in North Dakota and/or Michigan in December 2001 or January 2002, and, 3) evidence of the fact that Gaede took moneys from Wicks' bank account [in] Wisconsin in January 2002.

The State claimed that evidence was admissible to show Gaede's "motive, intent, preparation or plan for Wicks' murder." This record does not reflect that Gaede made a pretrial motion to preclude the State from using that evidence.

[¶ 22] At trial, Gaede did not object to Fruge's testimony about Gaede's Wisconsin convictions for "some felonies." When the State offered evidence about Gaede's January 2002 withdrawals from Wicks' bank accounts in Wisconsin, Gaede objected on the ground of relevance. The State argued the evidence was "an indication of [Gaede's] intent and/or plan in this case to kill ... Wicks, and then benefit from his death by stealing his money." The district court overruled Gaede's objection and subsequently allowed Gaede to make an additional record:

[DEFENSE COUNSEL]: Only to the extent, Your Honor, that the transactions in question are some time removed from the date of the alleged offense here in Cass County, that being on or about the 28th of December. I think it's obvious where the State is going. Those-the argument of course goes to motive. Before motive becomes even something the jury can consider, the State hasn't made a prima facie case that the homicide was committed here in Cass County. To this point, the only evidence that a homicide was committed here in Cass County is the statement of Diana Fruge. Her statement has been compromised by her statements to several other individuals on several other occasions that she in fact was the responsible party. The evidence in question is far more prejudicial than [probative]. Based on all those factors, we would ask the Court to reconsider its earlier decision and ask that the jury be instructed not to consider any of that evidence.

THE COURT: All right. As Mr. Boening had indicated, the evidence was being offered pursuant to Rule 404(b). Rule 404(b) would allow evidence of other crimes or wrongs or acts for purposes to prove such things as motive or plan or scheme or intent which Mr. Boening indicated was in fact the State's purpose. The burden is incumbent upon the State to state the purpose if they're offering

evidence under Rule 404(b). They have—Mr. Boening has also indicated that notice was provided in advance of trial as required by the rule.

As [Defense Counsel] correctly points out, the Court still has to conduct the weighing, the balancing under Rule 403. The Court rules that the probative value does substantially outweigh the danger of unfair prejudice. In this case I think the State's point about a plan or scheme—at least its theory is supported by other evidence. I'd also note that we have more than simply one withdrawal at one bank. We have a series of withdrawals over a very short period of time in different banks. On that basis, I do find that that balance of probative value does substantially outweigh the danger of unfair prejudice and my ruling stands.

[¶ 23] Later, the State offered certified copies of a second amended information and a criminal judgement in a North Dakota prosecution of Gaede for theft, theft by deception, and insurance fraud. Those documents involved Gaede's guilty plea to taking more than $500 from his Fargo employer between September 27 and December 13, 2001, to representing himself as Wicks and taking more than $500 from his Fargo employer between those dates, and to making a false statement to an insurance company between October and December 2001, which resulted in him and his dependents acquiring medical services in excess of $5,000. In each of these cases, Gaede was representing himself as Wicks. Gaede objected to the admission of that evidence on the ground of relevance, and the district court overruled Gaede's objection, citing its earlier ruling.

[¶ 24] Rule 404(b), N.D.R.Ev., deals with the admissibility of evidence of other crimes, wrongs, or acts, and provides:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. However, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

[¶ 25] Under N.D.R.Ev. 404(b), "evidence of prior bad acts or crimes is generally not admissible 'unless it is substantially relevant for some purpose other than to point out the defendant's criminal character and thus to show the probability that he acted in conformity therewith.'" *State v. Osier,* 1997 ND 170, ¶ 4, 569 N.W.2d 441 (quoting *State v. Biby,* 366 N.W.2d 460, 463 (N.D.1985)). Rule 404(b), N.D.R.Ev., acknowledges the prejudicial effect that prior bad act evidence may have on the trier of fact. *Osier,* at ¶ 4 (citing *State v. Micko,* 393 N.W.2d 741, 744 (N.D.1986)). Rule 404(b), N.D.R.Ev., does not authorize automatic admission of prior bad act evidence merely because the proponent advances a proper purpose for the evidence; rather, the relevance and probative value of the evidence must be demonstrated. *Osier,* at ¶ 4; *State v. Frye,* 245 N.W.2d 878, 884 (N.D.1976).

[¶ 26] Under N.D.R.Ev. 404(b), a district court applies a three-step analysis in considering the admissibility of evidence of other crimes, wrongs, or acts: 1) the court must look to the purpose for which the evidence is introduced; 2) the evidence of the prior act or acts must be substantially reliable or clear and convincing; and 3) in criminal cases, there must be proof of the crime charged which permits the trier of

fact to establish the defendant's guilt or innocence independently on the evidence presented, without consideration of the evidence of the prior acts. *State v. Parisien,* 2005 ND 152, ¶ 25, 703 N.W.2d 306; *State v. Ramsey,* 2005 ND 42, ¶ 23, 692 N.W.2d 498; *State v. Christensen,* 1997 ND 57, ¶ 7, 561 N.W.2d 631; *Micko,* 393 N.W.2d at 744. The final step in that analysis may usually be satisfied with a cautionary instruction about the evidence's admissibility and its use for a limited purpose. *Micko,* at 744. If a district court concludes this three-part test has been satisfied, the evidence is not automatically admissible, and the court must also consider whether, under N.D.R.Ev. 403, the probative value of the evidence outweighs any possible prejudicial effect. *Parisien,* at ¶ 25; *Ramsey,* at ¶ 26; *Micko,* at 744–45. This Court has also recognized that evidence of other crimes, wrongs, or acts may be admissible when " 'the evidence provides a more complete story of the crime by putting it in context of happenings near in time and place.' " *Biby,* 366 N.W.2d at 463 (quoting *Frye,* 245 N.W.2d at 883).

[¶ 27] We review a district court's evidentiary rulings under an abuse of discretion standard. *Ramsey,* 2005 ND 42, ¶ 8, 692 N.W.2d 498; *Christensen,* 1997 ND 57, ¶ 5, 561 N.W.2d 631. A district court abuses its discretion when its decision is arbitrary, capricious, or unreasonable, or when the court misapplies or misinterprets the law. *Ramsey,* at ¶ 8; *Christensen,* at ¶ 5.

[¶ 28] Here, we conclude the evidence of Gaede's prior conduct and convictions was admissible to show Gaede's motive and intent and to provide a more complete story of Wicks' death by putting it in context of happenings near the time and place of the death. The evidence of Gaede's conduct and the convictions was intertwined with the factual scenario leading up to Wicks' death and tends to demonstrate a motive or reason for Wicks' death. Moreover, the district court gave the following jury instruction about the use of that evidence:

For the purpose of showing motive, intent, scheme or plan with respect to the offense charged, the Court received evidence of other acts or offenses committed by the Defendant or others. Before considering evidence of other acts or offenses for this purpose, you must first find beyond a reasonable doubt that the Defendant committed the acts constituting the offense charged.

[¶ 29] The record reflects the district court made a reasoned analysis of the reasons for the admission of the evidence, and on this record, we cannot say the district court's decision to admit the evidence of Gaede's conviction of "some felonies" in Wisconsin and the convictions in North Dakota was arbitrary, capricious, or unreasonable, or was a misinterpretation or misapplication of the law. We therefore conclude the district court did not abuse its discretion in admitting that evidence.

V

[¶ 30] Gaede also argues he was denied a fair trial because the district court failed to inquire whether he knowingly waived his right to testify in this case. He asks this Court to revisit its recent decision in *State v. Mulske,* 2007 ND 43, ¶¶ 10–11, 729 N.W.2d 129, in which we followed prior precedent and held a court does not have a duty to verify that a defendant who does not testify at trial has waived his or her right voluntarily. *See State v. Antoine,* 1997 ND 100, ¶ 5, 564 N.W.2d 637. Gaede has presented no persuasive reason to reconsider *Mulske* or *Antoine.* Moreover, we also note that the North Dakota Trial Court Benchbook 1–73, ¶ 9, provides a checklist for a felony arraignment, which

includes a dialogue for the court to tell a defendant "you have the right at trial to testify or not testify as you alone may choose." We decline Gaede's invitation to revisit *Mulske* and *Antoine,* and we reject Gaede's argument that he was denied a fair trial because the district court failed to make this inquiry.

## VI

[¶ 31] We affirm the criminal judgment.

[¶ 32] GERALD W. VANDE WALLE, C.J., and DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.