2008 ND 203

**STATE of North Dakota, Plaintiff and Appellee**

**v.**

**Abraham ALVARADO, Defendant and Appellant**

**No. 20080107.**

Supreme Court of North Dakota.

Nov. 19, 2008.

Marlyce A. Wilder (argued), State's Attorney, and Nicole Foster (on brief), Special Assistant State's Attorney, Williston, ND, for plaintiff and appellee.

Kent M. Morrow (argued), Severin, Ringsak & Morrow, Bismarck, ND, for defendant and appellant.

KAPSNER, Justice.

[¶ 1] Abraham Alvarado appeals from a criminal judgment entered following a jury verdict finding him guilty of felonious restraint. We conclude the trial court did not err in admitting Cindy Alvarado's testimony regarding prior acts of domestic violence, and there was sufficient evidence to sustain the guilty verdict of felonious restraint. We affirm the judgment of the trial court.

I.

[¶ 2] The State charged Abraham Alvarado with felonious restraint in violation of N.D.C.C. § 12.1-18-02(2) for knowingly restraining another under terrorizing circumstances by grabbing Cindy Alvarado against her will, throwing her over his shoulder, and running toward their house on or about March 15, 2007.

[¶ 3] Prior to trial, the State filed a notice of N.D.R.Ev. 404(b) (character evidence) evidence. The State indicated the evidence at issue may not be a N.D.R.Ev. 404(b) issue, because the evidence was of activity in furtherance of the present charge of criminal activity. Abraham Alvarado objected to the use of any N.D.R.Ev. 404(b) evidence against him by the State. Abraham Alvarado moved to exclude the prospective testimony as to events between him and Cindy Alvarado which occurred prior to and subsequent to the evening of March 15, 2007. The State responded and requested Cindy Alvarado be allowed to testify to prior acts of domestic violence she experienced from Abraham Alvarado.

[¶ 4]  The trial court filed an order and determined Cindy Alvarado's prospective testimony regarding past incidents of domestic violence did not fall under N.D.R.Ev. 404(b).  Rather, the trial court analyzed Cindy Alvarado's prospective testimony under N.D.R.Ev. 402 (relevant evidence) and 403 (exclusion of relevant evidence).  The trial court held, "that incidents predating [Abraham Alvarado's] March 15, 2007, arrest are near enough in time and place to be relevant to the charge of felonious restraint and that the probative value of the evidence outweighs the prejudicial effect."  However, the trial court limited Cindy Alvarado's testimony.  The trial court noted:

> The Court will allow Cindy Alvarado to testify on direct examination to the first instance of domestic violence in December, 2006, . . . with the further limitation that her testimony be general—that the couple had a somewhat prolonged dispute resulting in [Abraham Alvarado] pushing her around and inflicting multiple bruises and pain.  The Court directs the State to instruct Cindy *not* to testify on direct examination that [Abraham Alvarado] was in possession of drugs at the time of the December, 2006, incident.  The Court will further allow Cindy to testify that [Abraham Alvarado] has during the time period of December, 2006, to March 15, 2007, used physical force to control and/or restrict Cindy's freedom of movement, some of which resulted in Cindy receiving marks and bruises.  Testimony about incidents after March 15, 2007, are not relevant and will not be allowed.

[¶ 5]  On February 19–20, 2008, Abraham Alvarado was tried before a jury.  In its opening statement, the State discussed incidents of past domestic violence that Abraham Alvarado committed against Cindy Alvarado.  The State then asserted: "You need to have this background in or-

der to have a context to place this relationship in.  You need to understand the constant state of fear that Cindy lived in, the survival that she was going through, in order to properly evaluate those terrorizing circumstances."  Cindy Alvarado testified:

Q  Are you familiar with the individual by the name of Abe or Abraham Alvarado?

A  Yes.

Q  How do you know him?

A  He is my husband.

. . .

Q  Going back several years ago, when did you first meet the defendant?

A  Several years ago.

Q  Did you have any sort of relationship with him at that time?

A  We were friends.

Q  Did it ever become anything more than a friendship at that time?

A  No.

Q  Within the last few years did you begin to have contact with the defendant again?

A  In 2006, I did.

Q  How did that happen?

A  When I finally talked to him he had been looking for me, trying to find me.

. . .

Q  Did the defendant indicate to you at that time he was looking for some sort of romantic relationship?

A  Not the first time I spoke to him, no.

Q  What happened after the first time?

A  I believe the next day roses came, and he started calling me and coming by my work.

Q  Was it that time that he indicated a romantic relation is what he was interested in?

A  Yes.

Q   What was your response?

A   I said no.

Q   You were not interested in that?

A   No, I wasn't.

Q   Then what happened?

A   He was just real persistent about a relationship, and it did evolve into that.

Q   When you say he was real persistent, what sort of things was he doing?

A   Just calling and just pursuing me.

. . .

Q   And, you indicate he asked you to marry him?

A   Yes. . . .   We were married in August [of 2006].

Q   And, at that point is he living with you?

A   Yes.

Q   After you're married how was your relationship during the early months? How did it go?

A   It was fine.

Q   Did you do normal things that couples did?

A   Yes.

. . .

Q   At some point in your relationship did things become violent?

A   Yes.

Q   When is the first time that you remember that happening?

A   I believe it was in December [of 2006].

Q   And, there had been a disagreement?

A   Yes.

Q   How did you feel after the disagreement?  Were you angry?

A   Yes.

Q   Because of what had happened did you feel as though the relationship needed to end?

A   Yes.

Q   What did you do?

A   I had put his things out on the steps and in the kitchen for him to take and leave.

Q   You wanted no further contact with him?

A   Uh-huh.

Q   What happened when he came home and found his stuff outside?

A   He became abusive and threw me around.

[Defendant made objection as to relevance, overruled.]

Q   Cindy, as a result of him coming in, you said he threw you around.  Do you mean that in the sense of him literally picking you up and throwing you?

A   Not literally picking me up, but shoving and pushing.

Q   As a result, did you suffer some pain and bruising on that instance?

A   Yes, I did.

Q   Were the bruises something that you had to disguise through clothing?

A   Yes.

Q   Now, between December [of 2006] and March of 2007, which is the time when the incident that we are here for, did the violence in the relationship continue?

A   Yes, it did.

Q   Were you free to come and go from your residence as you chose?

A   Not at certain times.

Q   What certain times are you not free to leave?

A   When there was an argument going on.

Q   And, how would your movement be restrained?

A   The keys would be taken to the vehicle.  Sometimes my purse, so I didn't have my purse.

Q   Would you physically be restrained from leaving?

A   Sometimes.

Q   How often would these arguments happen where you were restrained from leaving either by car keys or checkbook or physically?

A   I don't know, . . . every few weeks.

Q   It wasn't something that was an isolated incident?

A   No.

Q   When you would be physically restrained from leaving would you suffer bruising?

A   Sometimes.

Q   Pain?

A   Sometimes.

Q   Things that you would have to disguise with clothing?

A   Yes.

Q   After one of these incidents would happen how would you deal with it?

A   I kind of became removed, just really didn't want anything to do with him.

Q   And, what would happen when you would remove yourself from him for a period of time?

A   I would make him angry again.

Q   And, what would he do?

A   It depended on what the circumstances were.

Q   Would you be frightened?

A   Sometimes.

Q   What sort of threats would you hear?

A   If I left he would find me and he would kill me.

Q   Did you believe him?

A   Yes.

Q   Is that one of the reasons you stayed?

A   Yes.

Q   What are some of the other threats that he would say?

A   If he couldn't find me he had people that would find me.

[Defendant made objection, overruled.]

Q   It's fair to say between December and March this is a violent relationship?

A   Yes.

[¶ 6]   Cindy Alvarado testified on March 15, 2007, she was at home in bed. She woke up and heard voices downstairs. She went downstairs, and Abraham Alvarado was with a woman and his cousin. Cindy Alvarado told Abraham Alvarado she was going to her mother's house to stay.  Cindy Alvarado testified she went to Kallie and Levi Rider's house, her neighbors; to call for a ride, and Abraham Alvarado came over and told her to go home. She resisted, and Abraham Alvarado grabbed her shirt and it ripped.  Cindy Alvarado asked her neighbors to call the police.  Cindy Alvarado testified Abraham Alvarado picked her up and carried her home.  Cindy Alvarado testified Abraham Alvarado told her if the police showed up, she would be sorry.  Cindy Alvarado testified she perceived this as a threat.  She testified she does not think she was free to leave that night, and if she had tried to leave, she would have been physically restrained from leaving.

[¶ 7]   Kallie Rider testified that early in the morning on March 15, 2007, she woke up because she heard a female voice screaming and her doorbell was ringing. She walked to where the screaming was and "saw Cindy hovering by the door and Abe yelling at her."  Kallie Rider testified

she and her husband, Levi Rider, were scared, so they discussed what they should do. Kallie Rider testified she wondered: "If we let her in does he hurt us. If we don't, does he hurt her." Kallie Rider testified they tried to let Cindy Alvarado in, but Abraham Alvarado picked Cindy Alvarado up and took her away. Kallie Rider testified Cindy Alvarado was saying, "put me down" and "[h]elp, help." Kallie Rider testified she was in fear for Cindy Alvarado's safety. Kallie Rider also testified Abraham Alvarado said: "Don't call the cops. Don't call the fucking cops. Don't call the cops."

[¶ 8] The jury found Abraham Alvarado guilty of felonious restraint. Abraham Alvarado was remanded to the care, custody, and control of the North Dakota Department of Corrections and Rehabilitation, Bismarck, North Dakota, for ten years with two years suspended. Abraham Alvarado appeals, asserting the trial court erred in admitting evidence of previous incidents of domestic violence and arguing there was insufficient evidence to sustain the guilty verdict of felonious restraint.

## II.

■ [¶ 9] Abraham Alvarado argues the trial court erred by allowing the comments made by the State in its opening statement and Cindy Alvarado's testimony because both violated N.D.R.Ev. 404(b). The trial court determined the evidence at issue did not fall under N.D.R.Ev. 404(b). This Court has held: "We review a trial court's evidentiary ruling under an abuse-of-discretion standard." *State v. Hatlewick*, 2005 ND 125, ¶ 9, 700 N.W.2d 717. "A trial court abuses its discretion in evidentiary rulings when it acts arbitrarily, capriciously, or unreasonably or if it misinterprets or misapplies the law." *Id.* (quoting *State v. Ramsey*, 2005 ND 42, ¶ 8, 692

N.W.2d 498). "We apply this deferential standard of review to provide the trial courts with greater control in the admissibility of evidence." *State v. Christensen*, 1997 ND 57, ¶ 5, 561 N.W.2d 631 (citing *Knudson v. Director, North Dakota Dep't. of Transp.*, 530 N.W.2d 313, 316 (N.D. 1995)).

## A.

■ [¶ 10] Generally, evidence of a person's character to prove a person acted in conformity with the evidence is inadmissible. N.D.R.Ev. 404(a). Rule 404(b), N.D.R.Ev., provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. However, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Rule 404(b), N.D.R.Ev., is an embodiment of the common law. *Christensen*, 1997 ND 57, ¶ 8, 561 N.W.2d 631 (citing 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5239 (1978)). "The longstanding common law rule on prior-act evidence is that it is inadmissible when it is evidence of 'a wholly separate and independent crime' and is used to show a propensity to commit such acts." *Id.* (quoting 2 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 410 (1982)). This Court has held: "Rule 404(b) only excludes evidence of other acts and crimes committed by the defendant when they are *inde-*

*pendent* of the charged crime, and do not fit into the rule's exceptions." *Id.*

[¶ 11] In *Christensen*, Christensen was convicted of two counts of gross sexual imposition in June 1996. *Id.* at ¶ 2. At trial, evidence was introduced by the State "to show part of the preparation, the 'grooming,' Christensen undertook before he engaged in the criminal act." *Id.* at ¶ 8. This Court determined the "evidence showed Christensen had gained not only [the victim's] trust, but her parent's trust as well, and then used this trust to get closer to [the victim]." *Id.* This Court determined the evidence was not independent of the charged crime; rather, it was evidence of activity in furtherance of the same criminal activity. *Id.* Therefore, this Court determined the admission of the evidence did not raise a N.D.R.Ev. 404(b) issue. *Id.*

[¶ 12] In the present case, the trial court held the evidence at issue was not N.D.R.Ev. 404(b) evidence. The State called David Mathews to testify, and the trial court qualified him as an expert in the field of domestic violence. He testified:

Q   . . . One of the things I want to talk about is some of the other kind of control mechanism a batterer will use, and I don't mean to piecemeal this. If I am making it difficult for you to answer the questions please let me know. But, in some of the other areas of a domestic violence relationship will you a see a batterer restrict a victim's access to vehicles, money or friends or family, do you see those things happen as well as?

A   Absolutely, yes.

Q   Why?

A   It's all part of the process of to whatever degree if I were the abusive person, whatever degree I can control or to get this person to do what I need them to do. So I may start out with just using some verbal language. And if that doesn't work I may progress to the next step. And if that doesn't work then I progress to another step. So, what we believe is violence includes everything that's a hurtful behavior, whether it's said or whether it's an action. So, it's everything from verbal. Whether it's name calling and it's inappropriate language all the way to the physical. And the controlling behaviors are on that continuum.

Q   Mr. Mathews, based upon what you just talked about, if we have a situation where a defendant or excuse me a batterer would indicate to a victim you can't leave the house and the batterer then takes the car keys, the victim leaves on foot. The victim comes back, is assaulted. The next time the batterer says, you can't leave and take the car keys, is a victim likely at that point, then, to not leave, keeping in mind the last time she actually left she was physically assaulted?

A   Yeah. . . . If I look at you wrong or if you know what's going to come next because we have already had that experience, and it could be worse.

The expert witness's testimony supports the proposition that the prior acts of domestic violence were not independent acts; rather, they were evidence of activity in furtherance of the same criminal activity, similar to the evidence admitted in *Christensen*. Therefore, the trial court did not abuse its discretion by holding the evidence at issue was not N.D.R.Ev. 404(b) evidence.

B.

[¶ 13] Ordinarily, prior act evidence would be analyzed under N.D.R.Ev.

404(b), but in the present case, the trial court did not abuse its discretion by not conducting a N.D.R.Ev. 404(b) analysis. Even if the trial court had gone through a N.D.R.Ev. 404(b) analysis, the evidence still could have been admitted.

[¶ 14] This Court has provided, according to N.D.R.Ev. 404(b), "evidence of prior bad acts or crimes is generally not admissible 'unless it is substantially relevant for some purpose other than to point out the defendant's criminal character and thus to show the probability that he acted in conformity therewith.'" *State v. Osier*, 1997 ND 170, ¶ 4, 569 N.W.2d 441 (quoting *State v. Biby*, 366 N.W.2d 460, 463 (N.D. 1985)). When considering N.D.R.Ev. 404(b) evidence, trial courts are to apply a three-step analysis to determine whether the evidence of other crimes, wrongs, or acts is admissible:

> 1) the court must look to the purpose for which the evidence is introduced; 2) the evidence of the prior act or acts must be substantially reliable or clear and convincing; and 3) in criminal cases, there must be proof of the crime charged which permits the trier of fact to establish the defendant's guilt or innocence independently on the evidence presented, without consideration of the evidence of the prior acts.

*State v. Gaede*, 2007 ND 125, ¶ 26, 736 N.W.2d 418 (citing *State v. Parisien*, 2005 ND 152, ¶ 25, 703 N.W.2d 306; *State v. Ramsey*, 2005 ND 42, ¶ 23, 692 N.W.2d 498; *State v. Christensen*, 1997 ND 57, ¶ 7, 561 N.W.2d 631; *State v. Micko*, 393 N.W.2d 741, 744 (N.D.1986)).

[¶ 15] Here, the evidence of Abraham Alvarado's prior conduct was admissible to show Abraham Alvarado's intent. *See* N.D.R.Ev. 404(b) (evidence of crimes, wrongs, or acts may be admissible to prove intent). Abraham Alvarado was charged with felonious restraint, which is defined

as: "Knowingly restrain[ing] another under terrorizing circumstances or under circumstances exposing him to risk of serious bodily injury[.]" N.D.C.C. § 12.1–18–02(2). This Court has defined "terrorizing circumstances" as "threats of violence or dangerous acts made with an intent to induce fear." *State v. Plentychief*, 464 N.W.2d 373, 376 (N.D.1990). The evidence of Abraham Alvarado's prior acts supports the proposition that Abraham Alvarado intended to induce fear in Cindy Alvarado.

[¶ 16] The evidence of Abraham Alvarado's prior conduct was also admissible to provide "'a more complete story of the crime by putting it in context of happenings near in time and place.'" *State v. Gefroh*, 495 N.W.2d 651, 654 (N.D.1993) (quoting *Biby*, 366 N.W.2d at 463). This Court has determined such evidence is an exception to N.D.R.Ev. 404(b) and is therefore admissible. *Biby*, 366 N.W.2d at 463 (citing *State v. Frye*, 245 N.W.2d 878, 883 (N.D.1976)).

[¶ 17] The evidence of prior acts presented was substantially reliable. Cindy Alvarado testified about the prior acts under oath. Her testimony was also supported by the expert witness's testimony about patterns of violence among domestic partners. The trial court limited the scope of testimony to prior acts near in time to March 15, 2007.

[¶ 18] Additionally, there was proof of the crime charged without consideration of the prior acts. Cindy Alvarado testified Abraham Alvarado picked her up and carried her home. She testified he told her if the police showed up, she would be sorry, and Cindy Alvarado perceived this as a threat. Kallie Rider testified Abraham Alvarado picked Cindy Alvarado up and took her away. Kallie Rider testified Cindy Alvarado was saying, "put me down" and "[h]elp, help." Levi Rider testified Abra-

ham Alvarado tossed Cindy Alvarado over his shoulder, and Cindy Alvarado was saying: "Help me, call the cops." Thus, if the trial court would have conducted a N.D.R.Ev. 404(b) three-step analysis, it would have been satisfied.

[¶ 19] If evidence satisfies the N.D.R.Ev. 404(b) three-step analysis, it is not automatically admissible. *Gaede*, 2007 ND 125, ¶ 26, 736 N.W.2d 418. "[T]he [trial] court must also consider whether, under N.D.R.Ev. 403, the probative value of the evidence outweighs any possible prejudicial effect." *Id.* (citing *Parisien*, 2005 ND 152, ¶ 25, 703 N.W.2d 306; *Ramsey*, 2005 ND 42, ¶¶ 25–26, 692 N.W.2d 498; *Micko*, 393 N.W.2d at 744–45). In the present case, the trial court analyzed the evidence under N.D.R.Ev. 403 and determined the evidence was probative in that it would provide "a more complete story of the crime by putting it in context of happenings near in time and place." The trial court held the probative value of the evidence outweighed its prejudicial effect.

### III.

[¶ 20] Abraham Alvarado asserts there was insufficient evidence to sustain the guilty verdict of felonious restraint. Abraham Alvarado argues the only statement he made during the incident was, "you'll be sorry," and he asserts this statement was ambiguous and did not contain a threat of violence. The State contends, based on the entire trial court transcript, there was sufficient evidence to convict Abraham Alvarado. When we review challenges regarding the sufficiency of the evidence, "we must draw all inferences in favor of the verdict." *State v. Curtis*, 2008 ND 108, ¶ 28, 750 N.W.2d 438 (citing *State v. Curtis*, 2008 ND 93, ¶ 5, 748 N.W.2d 709; *State v. Barendt*, 2007 ND 164, ¶ 9, 740 N.W.2d 87). "Appellate review of the sufficiency of the evidence for a jury verdict is very limited. On appeal, we look only to the evidence most favorable to the guilty verdict and the reasonable inferences therefrom to see if there is substantial evidence to warrant a conviction." *State v. Freed*, 1999 ND 185, ¶ 4, 599 N.W.2d 858 (citations omitted).

[¶ 21] Section 12.1–18–02(2), N.D.C.C., titled felonious restraint, provides: "A person is guilty of a class C felony, if he: ... Knowingly restrains another under terrorizing circumstances or under circumstances exposing him to risk of serious bodily injury[.]" The statute does not define "terrorizing circumstances." N.D.C.C. § 12.1–18–02(2); *see Plentychief*, 464 N.W.2d at 374. This Court has defined "terrorizing circumstances" as "threats of violence or dangerous acts made with an intent to induce fear." *Plentychief*, 464 N.W.2d at 376; *see* N.D.C.C. § 12.1–17–04. This Court has held:

> No precise words are necessary to convey a threat. It may be bluntly spoken, or done by innuendo or suggestion. A threat often takes its meaning from the circumstances in which it is spoken and words that are innocuous in themselves may take on a sinister meaning in the context in which they are recited.

*Gefroh*, 495 N.W.2d at 655 (citations omitted).

[¶ 22] The evidence proved Abraham Alvarado picked up Cindy Alvarado and carried her away. Kallie Rider testified Cindy Alvarado was saying, "put me down" and "[h]elp, help." Additionally, Kallie Rider testified Abraham Alvarado said: "Don't call the cops. Don't call the fucking cops. Don't call the cops." Abraham Alvarado asserted he said, "you'll be sorry," and he contended this statement was ambiguous. However, threats do not have to be precise and can be made by suggestion. *Id.* Considering all of the

evidence that is favorable to the guilty verdict, there was sufficient evidence to convict Abraham Alvarado.

## IV.

[¶ 23]   We affirm the judgment; the trial court did not abuse its discretion by admitting the prior acts of domestic violence, and there was evidence sufficient to sustain the guilty verdict.

[¶ 24] GERALD W. VANDEWALLE, C.J., MARY MUEHLEN MARING, DANIEL J. CROTHERS and DALE V. SANDSTROM, JJ., concur.