2016 ND 28

STATE of North Dakota, Plaintiff and Appellee

v.

Ryan Neil ANDERSON, Defendant and Appellant.

No. 20150015.

Supreme Court of North Dakota.

Feb. 18, 2016.

Paul R. Emerson, Assistant Attorney General, Office of the Attorney General, Bismarck, ND, for plaintiff and appellee.

Benjamin C. Pulkrabek, Mandan, ND, for defendant and appellant.

McEVERS, Justice.

[¶ 1] Ryan Anderson appeals from a district court's criminal judgment entered after a jury found him guilty of murder. Anderson argues the judgment should be reversed because the district court erred by allowing testimony on Anderson's post-arrest silence and allowing improper comments by the prosecutor which amounted to prosecutorial misconduct. Anderson further argues the district court abused its discretion by giving a jury instruction on flight and failed to give a curative instruction on testimony that should have been excluded based on a pretrial order. We affirm.

I

[¶ 2] In March 2013, the State charged Anderson with class AA felony murder after he killed Christopher King by stabbing him four times at Capitol Lodge "man camp" near Tioga, North Dakota.

[¶ 3] According to testimony, Anderson moved to Tioga, North Dakota, to work in the oil fields as a foreman on a surveying crew. He hired family members and friends to work for him, including Rebecca Rodgers, his fiancee; Julie Benson, his aunt; and Christopher King, his best friend and the victim. Anderson also hired others, including, Dave Nardi, Keith Hansen, and Joseph Dekeado. Anderson and the members of his crew lived at Capital Lodge.

[¶ 4] Anderson testified that he and members of his crew went to a local bar. Anderson drank heavily throughout the night. At one point, he left to find Rodgers and Benson at a different bar. Anderson testified, after finding Rodgers and Benson, he blacked-out and did not remember anything until returning to Capital Lodge early that morning. He testified his next recollection of the night was knocking a glass of ice out of Rodgers' hand and telling her to go to bed. Nardi and Hansen testified they restrained Anderson in order to protect Rodgers. Anderson testified the next thing he remembered was work-related arguments with Nardi, Hansen, and King in the Capital Lodge commons area. Anderson testified the arguments turned physical between King and himself. Anderson testified that, after the altercation, he returned to his room. Anderson testified that he came back out of his room, King approached him in the hallway, and he stabbed King four times in self-defense, twice in the stomach and twice in the chest. On direct examination, Detective Caleb Fry, of the Williams County Sheriff's Office, laid foundation for the admission of surveillance footage showing the incident.

[¶ 5] Anderson and Hansen testified they loaded King into Anderson's pickup and drove King to the Tioga Medical Center. Hansen testified that, once at the Medical Center, Anderson wanted to leave King in the parking lot. Hansen testified he refused to leave King in the parking lot and Anderson assisted King to the front door of the Medical Center where medical staff loaded King onto a gurney and took him inside. Hansen testified Anderson

asked Hansen to leave the Medical Center with him, but Hansen refused. King was pronounced dead at the Medical Center. Tioga Police Officer Kyle Martin was dispatched to the Medical Center after the incident was reported. Officer Martin testified he arrived at the Medical Center and a nurse explained to him King was dead and Anderson was attempting to leave out the front lobby. Officer Martin testified that, when he arrived in the lobby, Anderson looked at him and then looked at the door. Officer Martin announced himself as a police officer, then he "pursued [Anderson] to the front door." Officer Martin testified he grabbed Anderson, Anderson began "flailing his hands and his body" attempting to get away, and then he put restraints on Anderson. Officer Martin testified Anderson stated, "I didn't mean to do it" and that Anderson was trying to defend himself. Anderson was transported to the Williams County Correctional Center where he was placed under arrest for murder.

[¶ 6] On direct examination, the State asked Detective Fry whether Anderson made a statement at the Williams County Correctional Center after Detective Fry informed Anderson he was under arrest for murder. Detective Fry testified Anderson did not make a statement and put his head down on the counter. Anderson's counsel did not object to the State's question or Detective Fry's answer. No further comment on Anderson's post-arrest silence was made during the trial.

[¶ 7] On direct examination, the State asked Hansen about the events leading up to the incident. Hansen testified that, at one point, Anderson knocked Rodgers' glasses off her face, breaking them. Hansen then testified Rodgers commented that "this is the stuff that he does to me. He always takes my glasses." Anderson's counsel objected on the grounds that the

district court previously denied the State's motion to offer evidence of domestic violence under N.D.R.Evid. 404(b) before trial, and that the district court ordered evidence of Anderson's past domestic violence was inadmissible. The district court sustained Anderson's objection and told the State to "keep ... a little bit tighter control" on the questioning. Later, on direct examination, Hansen testified Rodgers told him things Anderson previously had done to her. Anderson's counsel again objected. Outside the hearing of the jury, the district court found no misconduct occurred in the form of the question and invited the parties to submit a proposed limiting instruction on prior bad acts.

[¶ 8] During cross-examination of Anderson, the State asked Anderson about the amount of time he spent going over his testimony. Anderson testified he had not even gone through his testimony one full time because "he refused." During the State's rebuttal closing argument, the State referred to Anderson's answer concerning his testimony preparation on cross-examination as "ridiculous." Anderson's counsel did not object to the State's questions on cross-examination or to the State's comment in closing argument.

[¶ 9] The State submitted its proposed jury instructions. The State included an instruction on Anderson's "flight" at the hospital as circumstantial evidence of his consciousness of guilt. Anderson objected to the instruction, arguing the instruction was not appropriate because Anderson did not immediately flee after he stabbed King. The district court overruled the objection and allowed the jury instruction on flight. The State also submitted a proposed limiting instruction on prior bad acts as requested by the district court. Anderson objected to the State's proposed limiting instruction, but did not submit an

alternative instruction. The district court did not use the State's instruction.

[¶ 10] The jury found Anderson guilty of murder. The district court sentenced Anderson to twenty years in prison. Anderson appeals the district court's criminal judgment of conviction entered on the jury's guilty verdict.

## II

[¶ 11] Anderson argues he was denied a fair trial because the district court allowed the State to introduce testimony about his post-arrest silence in violation of his Fifth Amendment right to remain silent. Anderson further argues, despite not raising an objection at trial, Detective Fry's comment rises to the level of obvious error and affected his substantial rights. The State conceded at oral argument the question should not have been asked, but argues Detective Fry's comment on Anderson's post-arrest silence was harmless.

[¶ 12] "When a defendant invokes his Fifth Amendment right against self-incrimination by choosing to remain silent, it is a violation of the defendant's due process rights to use his silence for impeachment." *State v. Hill*, 1999 ND 26, ¶ 16, 590 N.W.2d 187; *see also Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). "[An] [i]mproper comment about a defendant's invocation of the right to remain silent is a constitutional error that may be reviewed on appeal even though not raised at trial." *State v. Gaede*, 2007 ND 125, ¶ 18, 736 N.W.2d 418.

[¶ 13] During trial, the State called Detective Fry to testify about his initial interview with Anderson after his arrest:

Q. And when you got to Williams County Correctional Center, what happened there?

A. Ryan Anderson had been brought by another deputy to the correctional center, and I informed Mr. Anderson that he was under arrest for Murder.

Q. Of Christopher King?

A. Of Christopher King.

. . .

Q. Thank you. Did Mr. Anderson make any statement at that time?

A. He did not.

Q. Did he—how did he respond to your placing him under arrest?

A. He put his head down on the counter when I informed him of that.

The record does not establish whether Anderson's silence was post-*Miranda* warning, or whether Anderson invoked his Fifth Amendment right to remain silent.

[¶ 14] Here, the State asked whether Anderson made a statement after his arrest. Based on the State's concession at oral argument that the question should not have been asked, we assume the response "he did not" was an improper comment of Anderson's post-*Miranda* silence; therefore, a harmless error analysis is appropriate. *See Gaede*, 2007 ND 125, ¶ 18, 736 N.W.2d 418. However, when the State is the beneficiary of a constitutional error, it must prove beyond a reasonable doubt that comments on Anderson's post-arrest silence did not contribute to the verdict. *See State v. Rivet*, 2008 ND 145, ¶ 15, 752 N.W.2d 611. In *Gaede*, we outlined the following factors for deciding whether an improper comment about a defendant's post-arrest silence was harmless error:

1. The use to which the prosecution puts the post arrest silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference.

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.

2007 ND 125, ¶ 18, 736 N.W.2d 418.

[¶ 15] The testimony about Anderson's post-arrest silence was in response to a question from the State and, arguably, was used as substantive evidence of his guilt. However, Detective Fry's comment was brief, only three words. The State did not refer to his silence at any other time during the trial or in closing arguments. Anderson did not object or move for a mistrial, giving the trial judge no opportunity to grant such motion or give a curative instruction. Whether a curative instruction would have made any difference here is questionable. *See State v. Janda,* 397 N.W.2d 59, 66 (N.D.1986) (discussing cases expressing serious reservations about the efficacy of curative instructions).

[¶ 16] Of primary importance is the *quantum of evidence indicative of guilt.* Anderson does not challenge the sufficiency of the evidence against him on appeal. It is undisputed that Anderson killed King. There is ample evidence on the record from which the jury could reasonably infer that Anderson did not act in self-defense. Joseph Dekeado testified during trial that Anderson had previously chased King with an axe and threatened to kill him if they ever fought again. According to testimony, Anderson had many opportunities to retire to his room for the night but, instead, he chose to continue engaging in physical altercations with members of his crew. The jury also had an opportunity to view the surveillance footage admitted into evidence showing the incident.

[¶ 17] While we do not condone the State asking Anderson about not making a statement, after reviewing the entire record and considering the relevant factors, we conclude any error in allowing Detective Fry's brief testimony about Anderson's post-arrest silence was harmless beyond a reasonable doubt.

### III

[¶ 18] Anderson argues the State engaged in prosecutorial misconduct violating his due process right to a fair trial by asking Anderson on cross-examination how much time he spent preparing his trial testimony, by referencing inadmissible police reports, and by referring to his trial preparation in closing arguments.

[¶ 19] Anderson concedes he did not assert prosecutorial misconduct in the district court, nor did he object to the alleged instances of misconduct. In *State v. Vondal,* this Court articulated the standard for determining whether the State engaged in prosecutorial misconduct when asserted for the first time on appeal:

We first determine whether the prosecutor's actions were misconduct and, if they were, then we examine whether the misconduct had prejudicial effect. *See State v. Burke,* 2000 ND 25, ¶¶ 25–30, 606 N.W.2d 108 (whether the prosecutor's actions affected the defendant's substantial rights was only considered after determining the actions were misconduct). To determine whether a prosecutor's misconduct rises to a level of a due process violation, we decide if the conduct, in the context of the entire trial, was sufficiently prejudicial to violate a defendant's due process rights. *State v. Kruckenberg,* 2008 ND 212, ¶ 20, 758 N.W.2d 427. When a defendant fails to object to alleged misconduct, we will not reverse unless the misconduct constitutes obvious error. *State v. Evans,* 1999 ND 70, ¶ 9, 593 N.W.2d 336. Our review is limited to determining if

the prosecutor's conduct prejudicially affected the defendant's substantial rights, so as to deprive the defendant of a fair trial. *State v. Burke,* 2000 ND 25, ¶ 22, 606 N.W.2d 108. In deciding if there was obvious error, we consider the probable effect of the prosecutor's improper comments on the jury's ability to judge the evidence fairly. *Evans,* at ¶ 9. Obvious error is noticed only in exceptional circumstances in which the defendant has suffered a serious injustice. *State v. Duncan,* 2011 ND 85, ¶ 18, 796 N.W.2d 672 (quoting *Evans,* at ¶ 9).

2011 ND 186, ¶ 12, 803 N.W.2d 578 (quotation and internal quotation marks omitted). "To establish obvious error, a defendant has the burden to show (1) error, (2) that is plain, and (3) affects substantial rights." *State v. Anderson,* 2003 ND 30, ¶ 8, 657 N.W.2d 245. "In order to affect 'substantial rights,' an error must have been prejudicial, or affected the outcome of the proceeding." *State v. Erickstad,* 2000 ND 202, ¶ 22, 620 N.W.2d 136. "The burden is upon the defendant to show the alleged error was prejudicial." *State v. Jensen,* 2000 ND 28, ¶ 18, 606 N.W.2d 507. "To constitute obvious error, the error must be a clear deviation from an applicable legal rule under current law." *State v. Tresenriter,* 2012 ND 240, ¶ 12, 823 N.W.2d 774. "In analyzing obvious error, our decisions require examination of the entire record and the probable effect of the alleged error in light of all the evidence." *State v. Olander,* 1998 ND 50, ¶ 12, 575 N.W.2d 658.

### A

[¶ 20] Anderson argues the State engaged in misconduct by improperly inquiring into confidential attorney-client communications. Anderson also makes a bare-bones contention that his Sixth Amendment right to counsel has been violated by the State's inquiry into his trial preparation. Because he did not object at trial, Anderson invites us to review the record for obvious error.

[¶ 21] On cross-examination, the State asked Anderson how much time he spent preparing his testimony for trial:

Q. How many times do you think you've gone over your testimony in preparation for today?

A. A total of maybe one, not even entirely. I refused.

Q. One time? Is that your answer?

A. Not entirely one time, sir.

[¶ 22] Anderson asserts that, even though none of the questions mention Anderson's defense counsel, a defendant's trial preparation takes place in the presence of his attorney, and preparation for trial requires communication between a defendant and his attorney. Therefore, Anderson contends the State improperly inquired into confidential communications in violation of N.D.R.Evid. 502. Rule 502(b), N.D.R.Evid., provides:

*General Rule of Privilege.* A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client.

[¶ 23] The privilege is personal to the client and is waived if it is not asserted. *Weisser v. Preszler,* 62 N.D. 75, 82, 241 N.W. 505, 509 (1932). Anderson did not invoke the privilege at trial. Even if he had, the State merely asked Anderson how much time he spent preparing for his trial testimony. Presumably, the State was attempting to identify whether Anderson's testimony was rehearsed, which impacts its credibility. The State's questions about Anderson's trial testimony preparation constituted a legitimate form of impeachment under N.D.R.Evid. 607. Therefore, the State's

inquiry into Anderson's trial testimony preparation does not constitute obvious error. *See Vondal*, 2011 ND 186, ¶ 12, 803 N.W.2d 578 (we only consider whether the State's actions affect substantial rights after determining the action was misconduct).

[¶ 24] Anderson has failed to adequately support his contention that his Sixth Amendment rights have been violated and we will not further address the issue. *See State v. Haibeck*, 2006 ND 100, ¶ 9, 714 N.W.2d 52 ("Our Court will not consider an argument that is not adequately articulated, supported, and briefed.").

### B

[¶ 25] Anderson argues the State engaged in misconduct by referencing inadmissible police reports. On cross-examination, the State asked Anderson about whether he reviewed the police reports:

Q. Did you have an opportunity, while this case has been pending, to review the police reports, the discovery from this case?

A. One time when it was originally available, just that one time.

Q. So your answer is yes?

A. Yes.

Q. And in the initial witness statements given to law enforcement, no one mentions that you were choked. It's not until the depositions occurred three months later; is that correct?

A. I do not recall what's in the original police reports.

[¶ 26] Anderson had claimed he acted in self-defense and testified that he was choked the night of the incident. To attack the credibility of Anderson's testimony, the State asked Anderson whether he reviewed the police reports for the case. Police reports are generally inadmissible as evidence in a criminal matter under N.D.R.Evid. 803(8)(A)(iii). However, the State did not offer police reports into evidence and did not suggest Anderson review them to refresh his recollection. The State's reference to the police report lacking a reference to Anderson being choked was an attempt to attack the veracity of Anderson's testimony. We see no clear deviation from the law by the State attempting to impeach Anderson with inconsistencies in the evidence. The State's reference to the police report does not constitute obvious error.

### C

[¶ 27] Anderson argues the State engaged in misconduct by commenting on his trial preparation in closing argument. In rebuttal, the State argued Anderson's testimony regarding the amount of time he spent preparing trial testimony was not credible. The State asserted:

One of the things [Anderson] said is that he only went through his testimony not even one time all the way. The defense attorney commented on several things that they believe were ridiculous. I'd submit that that testimony is ridiculous. You're on trial for murder, and you don't even go through your testimony.

[¶ 28] "A district court has discretion to control closing arguments." *State v. Kruckenberg*, 2008 ND 212, ¶ 27, 758 N.W.2d 427. "We will not reverse a district court's control of closing argument absent a clear abuse of discretion." *Id.* "If the defendant does not object during closing argument, we will not reverse a decision unless the challenged remarks constitute obvious error affecting a defendant's substantial rights." *Id.* (quotation marks omitted). "In deciding if there was obvious error, we consider the probable effect of the prosecutor's improper comments on

the jury's ability to judge the evidence fairly." *Id.*

[¶ 29] After reviewing the record, we conclude Anderson has not established the State's remarks were improper. As noted above, the State's questions were a legitimate form of impeachment under N.D.R.Evid. 602. Here, the State attacked the veracity of Anderson's testimony that he refused to go through his testimony prior to trial. We conclude the State's remarks in closing argument do not constitute obvious error.

IV

[¶ 30] Anderson argues the district court erred in instructing the jury on flight because the evidence did not support Anderson fled immediately after the crime. The State argues the substantial evidence of Anderson's guilt supports the flight instruction and, even if the district court erred in giving it, the error was harmless.

[¶ 31] "We review jury instructions in light of the evidence presented to the jury, as established by the record on appeal." *State v. Kordonowy*, 2015 ND 197, ¶ 23, 867 N.W.2d 690. "This Court reviews the instructions as a whole to determine whether they adequately and correctly inform the jury of the applicable law, even though part of the instructions standing alone may be insufficient or erroneous." *Erickstad*, 2000 ND 202, ¶ 16, 620 N.W.2d 136. "If, when considered as a whole, a jury instruction correctly advises the jury of the law, it is sufficient even if part of it standing alone may be insufficient." *State v. Barth*, 2001 ND 201, ¶ 12, 637 N.W.2d 369.

When a trial court has chosen a specific instruction, a reviewing court should not be quick to second-guess its choice, if there is evidence or inferences from the evidence to support it.... Only scant evidence may be needed to support a jury instruction. Where there is no evidence to support a particular theory, there should be no instruction on it; but if the evidence admits of more than one inference, an instruction is proper.

*Tidd v. Kroshus*, 2015 ND 248, ¶ 7, 870 N.W.2d 181 (quoting *Cartier v. Northwestern Elec., Inc.*, 2010 ND 14, ¶ 11, 777 N.W.2d 866).

[¶ 32] Both parties submitted proposed jury instructions. The State's proposed jury instructions contained an instruction on a defendant's flight:

Flight. The voluntary flight of a Defendant immediately after the commission of a crime is not sufficient in itself to establish guilt, but it is a circumstance which, if proved, you may consider in the light of all other evidence of the case, in determining guilt or innocence. You alone must determine whether the evidence of flight shows a consciousness of guilt and the significance of that evidence.

The jury instruction is based on a pattern jury instruction. This Court has repeatedly cautioned on the use of pattern jury instructions explaining:

The North Dakota Pattern Jury Instructions are published as a guide by the State Bar Association, in conjunction with the North Dakota Pattern Jury Instruction Commission. The pattern jury instructions are not controlling law, and are published with the caution that they are "neither a restatement nor an encyclopedia of the prevailing law."

*State v. Romero*, 2013 ND 77, ¶ 18, 830 N.W.2d 586. Anderson objected to the State's proposed flight instruction on a factual basis, arguing the instruction should not be used because he did not immediately flee after the commission of a crime and, instead, he drove King to the hospital for treatment. Anderson did not

argue the jury instruction misstated the law. On appeal, Anderson has not cited any legal authority for his proposition that the use of the word "immediately" in the jury instruction should preclude the use of the instruction based on the facts of this case.

[¶ 33] This Court has held that a jury may be instructed on flight when justified by the evidence a person's flight immediately after the commission of a crime as a circumstance that may be considered in determining the probability of guilt or innocence. *State v. Carter*, 50 N.D. 270, 283, 195 N.W. 567, 571 (1923). This Court has not addressed the immediacy factor of a defendant's flight following the commission of a crime. "Although federal law is not binding on our interpretation of state law, we can look to federal law for guidance when it is helpful and sensible to do so." *State v. Rufus*, 2015 ND 212, ¶ 16, 868 N.W.2d 534.

[¶ 34] "It is well settled that flight of the accused subsequent to the commission of a crime is, in certain instances, 'a circumstance proper to be laid before the jury as having a tendency to prove his guilt.'" *United States v. Peltier*, 585 F.2d 314, 322 (8th Cir.1978) (quoting *Allen v. United States*, 164 U.S. 492, 499, 17 S.Ct. 154, 41 L.Ed. 528 (1896)). However, doubt has also been expressed as to the probative value of flight. *Id.* at 323. Although the plain language of the instruction appears to require the flight occur immediately after the commission of the crimes, similar instructions have been used when the flight was many hours after the commission of the crime. *See United States v. Rowan*, 518 F.2d 685, 691 (6th Cir.1975) (flight instruction not improper when defendant left the community within 36 hours of the commission of the crime); *United States v. El–Alamin*, 574 F.3d 915, 921, 927 (8th Cir.2009) (flight instruction

not improper when defendant ran after seeing law enforcement 72 hours after controlled buy); *but see United States v. Myers*, 550 F.2d 1036, 1050 (5th Cir.1977) (indicating evidence of flight three to six weeks after robbery did not demonstrate flight immediately after commission of the crime). As noted in *Myers*:

> The immediacy requirement is important. It is the instinctive or impulsive character of the defendant's behavior, like flinching, that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses. The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.

550 F.2d at 1051 (citation omitted).

[¶ 35] Here, Hansen testified he rode with King and Anderson to the hospital. Hansen testified that once they arrived at the hospital, Anderson wanted to leave King in the parking lot. Hansen testified that, after Anderson helped King out of the pickup and once King was inside the hospital, Anderson pled with him to leave again, exclaiming, "We got to go! We got to go! We got to get out of here!" Hansen testified that, after he refused to leave the hospital again, Anderson finally agreed to stay. Officer Martin testified he arrived at the Medical Center and staff directed him to the front lobby where Anderson was attempting to leave. Officer Martin testified that Anderson was "approximately six to seven feet" from the lobby door. Officer Martin testified, "As soon as I saw the lobby I saw Ryan Anderson. He was heading toward the front door of the lobby. Ryan Anderson looked at me, then looked at the front door. I did announce myself as a police officer, and then I pursued him to the

front door." Officer Martin testified that he grabbed Anderson and Anderson briefly struggled by "flailing his hands and his body." Officer Martin put restraints on Anderson and explained to him that he was being detained. Officer Martin testified Anderson made utterances of, "I didn't mean to do it," and that he was trying to defend himself.

[¶ 36] The evidence supports that Anderson attempted to leave after seeing Officer Martin and briefly struggled to avoid being restrained. Anderson's presence at the hospital was part of a continuing chain of events. The jury instruction clearly states that flight alone is not sufficient to establish guilt, and leaves to the jury to consider the evidence presented. We conclude the district court did not err in providing the flight instruction to the jury. The flight instruction correctly stated the law, and the evidence presented to the jury was sufficient to support a flight instruction.

## V.

[¶ 37] Anderson also argues the district court abused its discretion in failing to give a limiting instruction when Hansen testified about alleged domestic violence by Anderson against Rodgers excluded by a pretrial order. The State argues the district court invited instructions, but Anderson objected to the instruction proposed by the State. During the State's direct examination of Hansen, Hansen attempted to testify twice about prior acts of alleged domestic violence:

Q. Was there anything to do with some glasses?

A. Yes. At one point they were out in the hallway, and there was arguing going on between them, and Ryan grabbed towards her, and her glasses came off her face and broke. And he picked up one piece of her glasses.

And at that point she was crying, and I was trying to calm the situation down. And she said to me that, this is the stuff that he does to me. He always takes my glasses.

Anderson's counsel objected and the following colloquy occurred at the bench:

MS. FOSTER: There's a very specific pretrial ruling that any sort of comments or information about prior allegations not come in to say that—to have him say—not to mention, it's hearsay.

THE COURT: Okay. This wasn't exactly a responsive, but do you want to respond to the objection?

MR. EMERSON: I think he was just giving his impression of what was going on. There was an excited utterance by Ms. Rogers.

MS. FOSTER: And it's—

THE COURT: Well, I'd like to—I'm going to sustain the objection right now.

MR. EMERSON: Okay.

THE COURT: And then just try to keep it a little bit tighter control on the question/answer.

The State continued its direct examination of Hansen and, again, Hansen attempted to testify about comments made by Rodgers regarding Anderson's conduct:

Q. Without saying what they said, okay, what did—what was Becca's reaction to these things that you are testifying to?

A. She was sitting on the couch, and, yeah, she was saying things that he had done previously to her.

Anderson's counsel objected and asked for the jury to leave the room. The following colloquy occurred outside the hearing of the jury:

MS. FOSTER: Your Honor, there is a very specific pretrial ruling in this particular case that says, any prior allegations of domestic violence between these two parties is not to be indicated to the jury. We have now had that happen twice.... [W]e are going to have to figure out some sort of written instruction, or something, to advise the jury that any sort of information that the Court specifically has stricken, that they not consider....

THE COURT: Right. Duly noted. I don't see any misbehavior by the State. That last question was very specific. What more can you do? But the State, I'd like to hear a response if you want to make anything. I don't find any misbehavior on your part at this point.

MR. EMERSON: Okay. Yeah, just trying to direct the testimony so he won't say specific comments that were made....

The district court instructed the parties that they could submit a proposed curative instruction on prior bad acts. The State submitted a proposed instruction and Anderson objected stating, other than Hansen's testimony, no other instances of Anderson's prior bad acts were mentioned. The district court did not use the instruction. Anderson did not submit an alternative instruction. Anderson did not object to the district court failing to instruct the jury on prior bad acts.

[¶ 38] Under N.D.R.Crim.P. 30(a)(3), the district court may require a party to make requests for jury instructions in writing. The rule further provides under subsection (c)(1), that "a party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection." A defendant must submit written instructions if he desires more comprehensive instructions. *State v. Marks,* 452 N.W.2d 298, 304 (N.D.1990).

[¶ 39] Under N.D.R.Crim.P. 30(c), Anderson waived his argument on appeal because he failed to object to the district court's failure to give a curative instruction. *See State v. Mathre,* 2004 ND 149, ¶ 21, 683 N.W.2d 918 ("[F]ailure to object at trial to jury instructions when there was an opportunity to do so operates as a waiver of the right on appeal to complain of instructions that either were or were not given."). "Nevertheless, an error that infringes upon substantial rights of a defendant is noticeable notwithstanding lack of an objection or in the absence of a request for an instruction." *Mathre,* 2004 ND 149, ¶ 21, 683 N.W.2d 918. As we noted earlier, to establish obvious error, a defendant must show: (1) error; (2) that is plain; and (3) affects substantial rights. *Anderson,* 2003 ND 30, ¶ 8, 657 N.W.2d 245. "We exercise our power to consider obvious error cautiously and only in exceptional situations where the defendant has suffered serious injustice." *State v. Glass,* 2000 ND 212, ¶ 4, 620 N.W.2d 146 (internal quotation marks omitted). When analyzing obvious error we examine the entire record for the probable effect of the alleged error in light of all the evidence. *Anderson,* 2003 ND 30, ¶ 8, 657 N.W.2d 245.

[¶ 40] The record reflects the district court ordered that evidence of past domestic violence would not be admissible at trial. At trial, the State asked questions that were not directly related to domestic violence, but nonetheless elicited answers about an argument between Anderson and Rodgers, her broken eye glasses, and "things he had done to her." Defense counsel quickly objected, the district court sustained the objections and

asked for curative instructions. Weighing the brief and vague references to alleged domestic violence against the evidence supporting the conviction, we are not convinced that the failure of the district court to give a curative instruction on prior bad acts caused Anderson to suffer a serious injustice.

## VI

[¶ 41] We affirm the criminal judgment.

[¶ 42] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS and CAROL RONNING KAPSNER, JJ.

SANDSTROM, Justice, dissenting.

[¶ 43] In view of misconduct by the prosecutor, rising to the level of denying Ryan Anderson a fair trial, I would reverse and remand for a new trial.

[¶ 44] Anderson had a constitutional right to remain silent after his arrest. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Yet the prosecutor elicited police testimony of Anderson's exercise of his right. It is improper to comment on a defendant's exercise of his constitutional right to remain silent. *See Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *United States v. Shannon,* 766 F.3d 346 (3d Cir. 2014); *United States v. Ramirez–Estrada,* 749 F.3d 1129 (9th Cir.2014); *United States v. Gentry,* 555 F.3d 659 (8th Cir. 2009).

[¶ 45] Anderson had a constitutional right to the assistance of counsel, and to the lawyer-client privilege in his preparation. U.S. Const. 5th Amend. Yet the prosecutor elicited testimony related to his assistance of counsel and preparing his testimony.

[¶ 46] Police reports were inadmissible, yet the prosecutor put the inadmissible evidence before the jury through improper questioning, and further extracted testimony from the defendant to put inadmissible evidence before the jury. *Glover v. Eighth Judicial Dist. Court of State ex rel. Cty. of Clark,* 125 Nev. 691, 220 P.3d 684, 692 (2009) ("improper advocacy that places prejudicial and inadmissible evidence before the jury can create an unacceptable risk of biased jury"); ABA Criminal Justice Section Standards 3–5.6(b) ("A prosecutor should not knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury."). In addition, the defendant's testimony was not a competent way to establish the content of the documents had they been admissible. Further, the questioning interfered with the right of a defendant to prepare his defense.

Q. Did you have an opportunity, while this case has been pending, to review the police reports, the discovery from this case?

A. One time when it was originally available, just that one time.

Q. So your answer is yes?

A. Yes.

Q. And in the initial witness statements given to law enforcement, no one mentions that you were choked. It's not until the depositions occurred three months later; is that correct?

A. I do not recall what's in the original police reports.

Q. And in the original police reports, there's no mention of anyone taunting you or doing anything to make you come out of your room; is that correct?

[¶ 47] Prosecutors must refrain from using methods calculated to produce a wrongful conviction. *United States v.*

*Young,* 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). I acknowledge that an over-zealous prosecutor may have succeeded in impermissibly prejudicing the jury, when a more attentive defense counsel would have moved for a mistrial or otherwise curtailed the prosecutorial misconduct, but this case rises to the level of plain error affecting substantial rights. *See State v. Patterson,* 2014 ND 193, ¶ 4, 855 N.W.2d 113 ("When analyzing claims of obvious error, this Court may 'notice a claimed error that was not brought to the attention of a trial court if there was (1) error, (2) that is plain, and (3) affects substantial rights.'" (quoting *State v. Clark,* 2004 ND 85, ¶ 6, 678 N.W.2d 765)).

[¶ 48] Prosecutors have a duty to do justice. N.D.R. Prof. Conduct 3.8 Cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice...."). "The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.... He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. U.S.,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Justice was not done here.

[¶ 49] DALE V. SANDSTROM